[L.A. No. 30217. In Bank. Sept. 19, 1974.]

JAMES J. McCARTNEY, a Judge of the Municipal Court, Petitioner, v. COMMISSION ON JUDICIAL QUALIFICATIONS, Respondent.

514

**516**

---

**COUNSEL**

Kayashima & Tessier and Ben T. Kayashima for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Robert F. Katz, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.**—We issued a writ of review in response to the petition of Judge James J. McCartney, filed pursuant to rule 920 of the California Rules of Court,[1] that we modify or reject the recommendation of the Commission on Judicial Qualifications (hereinafter the Commission) that he be removed from office.[2] Judge McCartney contends that the Commission has denied him procedural due process, that the charges of misconduct against him have not been sufficiently proven, and that any proven misconduct should be mitigated by his inexperience in office or as a justifiable response to an unprofessional effort by the local public defender to prevent him from hearing criminal cases. For the reasons stated below we conclude that the Commission's recommendation that Judge McCartney be removed from office be rejected but we further conclude that he be censured.

Following service as a deputy district attorney petitioner was elected a Judge of the Municipal Court for the San Bernardino Judicial District (Central Division) of San Bernardino County. He began his six-year term of office on January 4, 1971. As early as late March of that year the Commission began to receive letters from private citizens and attorneys alleging that petitioner had engaged in certain unbecoming conduct during a welfare fraud case. After consideration and examination of these complaints by informal letters of inquiry and a formal preliminary investigation (rule 904), the Commission charged petitioner with seven general counts (consisting of numerous subcounts) of wilful misconduct in office (hereinafter wilful misconduct) and conduct prejudicial to the administration of justice that brings the judicial office into disrepute (hereinafter prejudicial conduct). In accordance with the usual procedure (rules 905, 906, and 907) the Commission served its accusatory Notice of Formal Proceedings (hereinafter notice) containing these charges, petitioner filed a verified answer thereto, and this court appointed three special masters to take the extensive evidence in this matter.[3] After lengthy confidential hearings upon the

---

[1]All references herein to specific rules are to the California Rules of Court.

[2]California Constitution, article VI, section 18, subdivision (c) provides: "(c) On recommendation of the Commission on Judicial Qualifications the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of his duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of his current term that constitutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

[3]We appointed Thomas W. LeSage, Judge of the Superior Court of the County of Los Angeles (presiding master); William E. McGinley, Judge of the Superior Court

original charges and some new allegations added after the proceedings had commenced, the special masters issued their report summarizing the evidence for the Commission. The masters found that petitioner had in five specific instances engaged in prejudicial misconduct, but had not committed any acts of wilful misconduct. Based on that finding, the master's report recommended censure.

Upon consideration of the masters' report, written objections thereto by both petitioner and the examiner, and oral arguments, the Commission thereafter filed with this court its own unanimous findings of fact and conclusions of law. Impliedly rejecting the contrary view of the masters, the Commission found that petitioner had engaged in *both* acts of wilful misconduct and prejudicial conduct. While the Commission dismissed 15 of the various subcounts against petitioner, it concluded that each of the general counts in the notice had been fully or partially sustained by the evidence. Consequently, the Commission recommended to this court that petitioner be removed from office.[4] (Cal. Const., art. VI, § 18.) Pursuant to the provisions of the California Constitution, petitioner was thereby automatically disqualified from acting as a judge for as long as the Commission's removal recommendation remained pending before this court. (Cal. Const., art. VI, § 18, subd. (a).)

Disputing the Commission's recommendation, petitioner filed his petition for the instant review. Beyond challenging the Commission's removal recommendation on its merits, however, Judge McCartney also renews before this court certain objections which he repeatedly raised to the Commission's jurisdiction and procedures. Contending broadly that the entire proceedings leading up to the Commission's recommendation were violative of his constitutional rights, petitioner specifically asserts that the Commission denied him due process of law in (1) failing to accord proper notice of its preliminary investigation under rule 904(b), by (2) permitting amendment to the charges after the commencement of evidentiary hearings, in (3) denying his demands for public hearing, change of venue, and discovery by deposition, in (4) failing to accord him the right to disqualify Commission members, and (5) by neglecting to indicate what evidentiary standard it applied in reviewing the masters' report.

---

of the County of Los Angeles; and Sam Cianchetti, Judge of the Municipal Court for the Citrus Judicial District of Los Angeles County.

The hearings in this matter consumed 4 months during which the masters received the testimony of 175 witnesses and numerous exhibits. The record presented to us for review is comprised of 8,702 pages divided into 67 volumes.

[4]The Commission's vote was five for removal and two for censure.

In our view, these assertions that procedural defects in the Commission's proceedings amount to a denial of due process are without merit. The Commission's failure, for instance, to accord Judge McCartney notice of the preliminary investigation into the various incidents at issue other than the welfare fraud case, as prescribed in rule 904(b), entailed no fundamental unfairness. ■ In affording a judge "reasonable opportunity in the course of the preliminary investigation to present such matters as he may choose," rule 904(b) clearly affords to the judge more procedural protection than is constitutionally required. At the stage of the proceedings to which rule 904(b) applies, the Commission clearly has not yet commenced to perform any adjudicatory function, but is merely attempting to examine citizen complaints in a purely investigatory manner.[5] Accordingly, notice to the judge under investigation as to the nature of the complaints against him is not compelled as a matter of due process. (See *Hannah* v. *Larche* (1960) 363 U.S. 420 [4 L.Ed.2d 1307, 80 S.Ct. 1502].) Hence, relief from the deleterious effect, if any, of the Commission's failure to follow rule 904(b) may be secured by petitioner only upon a showing of actual prejudice. (Cf. *Light* v. *State Bar* (1939) 14 Cal.2d 328, 331-332 [94 P.2d 35], wherein the State Bar failed to accord notice as provided by statute; *McPheeters* v. *Board of Medical Examiners* (1947) 82 Cal.App.2d 709 [187 P.2d 116], wherein the board failed to provide notice of a continuance of hearings.) No such prejudice appears here. The record is clear that service of the notice detailing all seven general counts of misconduct against him, over three months before the evidentiary hearings gave petitioner adequate notice of charges and reasonable time to prepare his defense.

■ Petitioner's related assertion that the Commission's periodic exposure to reports of the investigation, unchallenged by explanations he would have submitted had it complied completely with rule 904(b), had a shattering impact upon its impartiality is without any evidentiary foun-

---

[5]After the fashion of the Federal Trade Commission, the instant Commission combines investigatory and adjudicatory functions, conducting a field investigation into the citizen complaints it has received which may divulge information later used to initiate the formal adjudicatory hearings against the particular judge under scrutiny. Testimony by the executive officer of the Commission in this case conclusively establishes that the investigation is entirely separate from the Commission's adjudicative role. The sole purpose of the preliminary investigation is to determine whether there is any factual basis for considering the initiation of a formal hearing and the incident drafting of a formal accusatory pleading. Furthermore, the investigation is not conducted by the Commission itself or its staff, but by independent special investigators from the California Attorney General's office.

dation. Hence, the admitted procedural irregularity[6] in the Commission's notice of the investigation cannot of itself impair the validity of its subsequent recommendation of removal. (Accord, *In re Robson* (Alaska 1972) 500 P.2d 657.)

■ Nor does there appear to be any substantial merit in the assertions that petitioner was denied due process when the Commission, pursuant to its own special rule, limited discovery to items other than depositions. In requesting the opportunity to take depositions of witnesses (or, in the alternative, to serve written interrogatories) in addition to the discovery permitted by the Commission, petitioner sought the discovery expressly authorized by statute (Gov. Code, § 68753 empowering the Commission to order depositions "[in] any pending investigation or formal proceeding"). ■ As matters of discovery are generally within the sound discretion of the initial trier of fact, however, we consider that the determination as to whether a discovery order shall issue is within the sound discretion of the Commission.

■ We cannot say that there has been such an abuse of that discretion here that petitioner was deprived of due process. Without deciding which discovery standard—the civil practice rule requiring a showing of relevance and materiality (Code Civ. Proc., § 2036) or the slightly more liberal criminal law requirement, that the information sought be demonstrated necessary for a fair trial (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 536 [113 Cal.Rptr. 897, 522 P.2d 305])—should apply to the Commission's proceedings, we believe that it was incumbent upon petitioner to make some minimal showing of good cause for the depositions. (See *Shively* v. *Stewart* (1966) 65 Cal.2d 475, 481-482 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 1431]; *Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 303-304 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].) Petitioner made no showing of good cause whatsoever, entirely failing to support his demand with appropriate affidavits and making the demand itself so general that the particular witnesses to be deposed were not even specified. By reason of such lack of clarity in his demand, petitioner has no cause for complaint that the request was refused.

Equally unfounded is petitioner's complaint that he should have been accorded an open hearing. ■ This state has adopted a constitutional policy that proceedings before the Commission shall be confidential (Cal. Const., art. VI, § 18, subd. (e), authorizing the Judicial Council to "make rules . . . providing for confidentiality of proceedings.") While such a

---

[6]Before this court, the Commission candidly concedes that there was no formal compliance with rule 904(b), except with respect to the *LaCroix* incident.

policy undoubtedly was adopted in part to protect the particular judge charged with misconduct and might, therefore, arguably be waived by him, we recognize that the provision for confidentiality also protects witnesses and citizen complainants from intimidation. Inasmuch as confidentiality is constitutionally authorized, is based on sound reason, and is imposed in proceedings which are neither criminal nor before a "court of justice" we perceive no impropriety in the Commission's refusal to open the hearings before the special masters to the public. (See *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867, 873-874 [206 P.2d 355]; see generally, *Woolley* v. *United States* (9th Cir. 1938) 97 F.2d 258, 262.)

We are likewise unpersuaded that there was an abuse of discretion in the Commission's refusal to return the proceedings to San Bernardino County. While neither the state Constitution itself nor the usual statutory venue rules make any provision as to venue for the Commission's proceedings, the Judicial Council, in the exercise of its constitutional power to fashion rules of court, has given the Commission authority to set the time and place for hearings. (Rule 907). ■ Accordingly, we perceive the place of hearing to be discretionary with the Commission. Furthermore, we find no abuse of that discretion in the Commission's determination here. Pomona was the city where the courtroom of the presiding special master was located. It was the available courtroom nearest to the courthouse in the City of San Bernardino where a rather undesirable emotion-charged atmosphere prevailed. At the same time, the Pomona location imposed only minimal inconvenience for the majority of witnesses who resided no more than 24 miles away in San Bernardino. Under these circumstances, the holding of the proceedings in Pomona was proper (see Gov. Code, § 68751 restricting the Commission's process to within 150 miles of where witnesses reside).

As to the merit of the contention that the examiner's amendments to the Commission's accusatory pleading after evidentiary hearings commenced was a denial of due process, we need not address ourselves. While there may be some force to petitioner's point that the provision for such amendment in rule 911 bears reconsideration in the light of the subsequent decision in *In re Ruffalo* (1968) 390 U.S. 544 [20 L.Ed.2d 117, 88 S.Ct. 1222] (finding a due process violation in somewhat similar amendment of the notice of charges in a state bar disciplinary matter), that issue is not properly before this court. ■ Petitioner's counsel expressly declined to challenge the validity of rule 911 before the special masters and proceeded to answer the new allegations. Such assertions of procedural defect will not be considered on review in the absence of a proper objection before the

masters or the Commission itself. (Cf. *Rosenthal* v. *Harris Motor Co.* (1953) 118 Cal.App.2d 403, 409 [257 P.2d 1034].)

Also without merit are each of petitioner's remaining assertions of procedural defect which are summarily rejected.[7]

Coming then to the merits of petitioner's case, we proceed to consider whether the allegations of misconduct against him have been proven "by clear and convincing evidence" sufficient to sustain them "to a reasonable certainty" (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 275.)

By way of the numerous subcounts which comprise the seven general counts in its notice, the Commission has charged that petitioner has engaged in a number of acts constituting wilful misconduct or prejudicial conduct. It is alleged that petitioner has engaged in a course of "intemperate language, displays of uncontrolled temper . . ., and . . . unreasonable verbal abuse" in criminal cases (count One) which has included the bullying and badgering of pro. per. defendants in an argumentative manner abusive to their rights and harmful to the reputation of the judiciary and the administration of justice (count Four). The Commission has further alleged that petitioner has committed similar "displays of anger, improper language, and bullying" in his relations with court personnel, to the detriment of a

---

[7]Contrary to the assertion of certain amici curiae that the Commission improperly considered hearsay evidence, we find the Commission to have been in substantial compliance with rule 909. That rule's requirement that the *Commission* must receive only "legal evidence" clearly applies to hearings, not to the preliminary investigation during which the particular hearsay statements of which amici complain were taken. The rule was fully observed here in that the only hearsay evidence received by the special masters was admitted into evidence pursuant to well-established exceptions to the hearsay rule.

We also reject the additional assertions that the Commission's failure to articulate standards, imprecision in findings, and rejection of petitioner's effort to disqualify Commission members rise to the dignity of a deprivation of due process. In connection with the action of administrative tribunals similar to the Commission, we have often recognized in the past a presumption that the administrative body concerned has found the necessary facts based on the evidentiary standards prescribed by applicable law (e.g., *City & County of S. F.* v. *Superior Court* (1959) 53 Cal.2d 236, 251 [1 Cal.Rptr. 158, 347 P.2d 294]). We adhere to that presumption here in declining to assume, in the absence of affirmative evidence to the contrary, that the Commission has ignored the "clear and convincing evidence" standard which we articulated in *Geiler* v. *Commission on Judicial Qualifications* ((1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1]) in making what we find upon examination to be sufficiently detailed findings of fact. We similarly decline to assume that the Commission members entertained a prejudice toward petitioner merely because, as he asserts, they considered the field reports of the Attorney General's special agents during the investigatory stages of the proceedings. No fundamental, unfairness or constitutional infirmity is inherent in such a combination of investigative and adjudicative functions.

"proper working relationship" between the judges and personnel in his district and to the harm of the administration of justice (count Two). Petitioner is also charged with being no less disrespectful to his brothers on the bench, having allegedly "engaged in conduct and language unbecoming a member of the bench . . . and tending to embarrass the members of the bench in [his] judicial district . . ." (count Five). The Commission also alleges that petitioner has been "grossly incompetent" in his relations with counsel, engaging in "improper criticism of counsel, prolonged and unnecessary argument with counsel, improper colloquy with counsel regarding the filing of affidavits of prejudice . . ., and badgering [of] . . . counsel . . ." (count Three). Furthermore, it is alleged that the foregoing mistreatment of defendants, personnel, and counsel has been coupled with "aggravated inefficiency and gross incompetence in conducting court"— including "long delays in issuing rulings from the bench"—which has resulted in the effective absence of any "competent judicial officer to perform the work normally" assigned to the judicial position which petitioner holds and which thereby materially impairs the administration of justice (count Six). Finally, it is alleged that petitioner has "not properly adhered to the judicial function," abdicating his judicial role on several occasions (count Seven).

█ In accord with our duty to independently evaluate the evidence adduced by the special masters (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 276), we have examined in full detail the record of proceedings before the Commission with respect to each of the foregoing charges. On the basis of that examination, we find the majority of the Commission's findings accurate, adopt them as our own, and enter the pertinent portions of those which we adopt in the margin.[8] As the

---

[8]The Commission's findings were as follows:

"FINDING

"1. Respondent is, and since January 4, 1971 has been, a judge of the Municipal Court of the San Bernardino County Municipal Court District.

FINDING (COUNT ONE C)

"2. In *People* v. *Ornelas* . . . , Judge McCartney harassed the defendant by repetitious questioning and repetitious reference to certain words and conduct of the defendant. Judge McCartney engaged in unconscionable harassment of defense counsel through repetitious and uncalled for questioning of the legal position counsel was advancing. Judge McCartney used intemperate language and engaged in uncalled for and unreasonable verbal abuse of the defendant and counsel, and gave the impression of bias towards the defendant and her counsel, Lane Stuart.

"Judge McCartney, throughout the proceeding, acted as an advocate justifying the proceedings over which he had presided previously rather than as a judge hearing without bias and prejudice motions made in good faith by counsel for defendant.

". . . . . . . . . . . . . . . . . . . . ."

remaining Commission findings are rejected,[9] we also enter several of our own independent findings of fact.[10]

---

"FINDING (COUNT TWO A)

"3. While presiding during probation and sentence in People v. LaCroix . . . on March 24, 1971, and after holding Mrs. LaCroix in contempt, Judge McCartney turned to his clerk, Mrs. Carol Perry, and stated in a loud voice, 'I heard that. You are in contempt. You are going to jail.' Mrs. Perry asked, 'What did I do? What did I do?' Judge McCartney shouted, repeatedly, 'Apologize! Apologize!' Mrs. Perry said, 'Well, I'm sorry.' She was not jailed. Mrs. Perry did not say anything prior to Judge McCartney's outburst. Judge McCartney then left the bench, stating that he was going to see her supervisor. When he returned to the courtroom he shouted, 'Leave my courtroom, you're no longer my courtroom clerk.' Judge McCartney was obviously angry when addressing Mrs. Perry, and his language was intemperate. Mrs. Carol Perry did cry in the courtroom and Judge McCartney did bully Mrs. Perry.

". . . . . . . . . . . . . . . .

FINDING (COUNT TWO B)

"4. Mrs. Nadine Waymire is the assistant clerk of the San Bernardino Municipal Court. Judge McCartney entered her office between 2:00 and 2:30 p.m., on March 24, 1971, and said, in a loud voice, 'I want another clerk, right now,' emphasizing each word by pounding his fist loudly on Mrs. Waymire's desk. Judge McCartney was upset and angry. . . .

". . . . . . . . . . . . . . .

"FINDING (COUNT TWO D-1)

"5. Judge McCartney replaced Judge William Johnstone in the Victorville Division of the San Bernardino Municipal Court on July 28, 1971. Robert Atkinson, the regular court reporter, reported the morning proceedings for Judge McCartney. Mr. Atkinson telephoned Mrs. Frances Rea and requested that she report the afternoon proceedings beginning at 1:30 p.m. Judge McCartney ordered Mr. Atkinson to return to his court at 1:00 p.m. At 1:08 p.m. Mr. Atkinson advised Judge McCartney that he was leaving on vacation and would be replaced by another reporter. Judge McCartney expressed no concern. Mrs. Rea arrived in Judge McCartney's courtroom at 1:25 p.m. At approximately 1:30 p.m. Judge McCartney orally ordered Deputy Marshal Michael K. Friesen to 'find Mr. Atkinson, arrest him, and bring him back to the courthouse.' Judge McCartney was visibly upset.

". . . . . . . . . . . . . . . .

"FINDING (COUNT THREE B)

"8. On June 25, 1971, Judge McCartney spent the court day in a preliminary hearing involving several counts of bookmaking (People v. Birch and Jennings). During the hearing Judge McCartney took several unexplained and unannounced recesses and, on many occasions, took an inordinate amount of time ruling on objections. After the matter was submitted, and before the defendants were held to answer, Judge McCartney sat back in his chair for a period of thirty to forty-five minutes, during which he did not speak but occasionally turned his chair around and faced the ceiling. This conduct was unexplained and the proceedings in the courtroom came to an uncertain halt during this period.

". . . . . . . . . . . . . . . .

These adopted and independent findings may be briefly summarized, along with certain supplementary facts drawn from the record itself as

#### "FINDING (COUNT THREE D)

"10. On January 3, 1972, in the case of *People* v. *Anderson,* Deputy Public Defender Raymond Rager appearing on behalf of the defendant, Judge McCartney addressed the following remarks to Mr. Rager concerning the propriety of the filing of Affidavits of Prejudice by the Public Defender's Office:

'. . . If you think I'm going to take away the dignity of this Court and what the people elected me to do, then you're out of your mind.

'I'll tell you another thing: Unless I get fairness in this thing, I might be running against other judges. I'm not going to sit up here and be the butt of abuse of the public defender.

'If I have to run again, I'm going to run again, I'm going to take this message to the people because it's unfair. I'm going to fight. I'm not about to put my tail between my legs. And if I have to run again for office, I'm going to do it. I'm not going to be pushed around by the Public Defender's Office and the abuse and the perversion that they have engaged themselves in emasculating an elected official of the people.

'And if you're ready to do it, I'll meet you anywhere, any time, any place, buddy, up to the United States Supreme Court, back down again to the court of public opinion and anywhere else where justice will stand up.

'I went to a conference in Monterey . . .

'This thing is being abused badly, and I'm not about to stand for it, and I'll fight it every time, every place, every corner where justice will permit me to do it.

'You might as well make your mind up to that, mister.'

"Judge McCartney made the above statement in a loud voice, with flushed face, and appeared to those present to be angry and excited.

". . . . . . . . . . . . . . .

#### "FINDING (COUNT FOUR C)

"13. Allan B. Cossentine on January 21, 1972, in the courtroom of Judge McCartney, attempted to file an Affidavit of Prejudice without knowledge of the appropriate statute. Judge McCartney asked Mr. Cossentine his reasons for requesting transfer to another department. Mr. Cossentine stated that he had experience in paramedicine, and that it was his opinion that Judge McCartney was under intense emotional and nervous pressure. When Deputy Public Defender Friedman attempted to assist the defendant, Judge McCartney stated that the Public Defender would first have to be appointed in the case, refusing his profferred assistance as inappropriate interference. Judge McCartney carried on an irrelevant, unnecessary, argumentative and undignified colloquy with Mr. Cossentine, a traffic case defendant appearing in propria persona, despite efforts of the latter not to become so engaged. Judge McCartney further bullied and badgered Mr. Cossentine and abused his rights, all harmful to the reputation of the judiciary and to the administration of justice.

". . . . . . . . . . . . . . .

#### "FINDING (COUNT FIVE A)

"14. The case of *People* v. *Julia Campbell* . . . was called for arraignment and disposition of certain motions in the courtroom of Judge McCartney on August 25, 1971, at 1:30 p.m. The defendant, a clerk in the Superior Court of San Bernardino County, was charged with a violation of Penal Code Section 187 (Murder). Presiding Judge Roy E. Chapman, at approximately 1:30 p.m., through his bailiff, ordered Judge McCartney to transfer the *Campbell* case to Judge Chapman's courtroom. Judge McCartney was on the bench and had called the *Campbell* case when he re-

follows: We perceive clear and convincing evidence that in one welfare fraud case petitioner angrily told a pro. per. defendant's wife to "shut up" or be held in contempt when she persisted in making a series of boisterous outbursts which interrupted the proceedings. In the same case, petitioner

---

ceived the order to transfer it. Judge McCartney ordered his bailiff, his court reporter, Mrs. Faith Hewitt, Clark Hansen, Deputy District Attorney, and Defense Attorneys Paul Steinman and Richard Beswick, to accompany him to Judge Chapman's chambers, where, in their presence, Judge McCartney had a discussion with Judge Chapman regarding the order for transfer which had been made. This discussion was reported by Mrs. Hewitt. Judge McCartney spoke in a high-pitched, excited voice and appeared to be angry. His voice was heard in the adjoining courtroom.

". . . . . . . . . . . . . ". . . . .

### "FINDING (COUNT SIX B)

"18. On March 17, 1972, during argument on a motion for new trial in *People* v. *Worley,* and on an issue totally irrelevant to the motion, Judge McCartney called both his bailiff and his clerk as witnesses and questioned them. Judge McCartney then left the bench, entered his chambers, removed his robe, returned to the courtroom in a suit coat, was sworn as a witness, took the stand and testified narratively at some length on the same irrelevant issue, during which time there was no judge on the bench.

". . . . . . . . . . . . . ". . . . .

### "FINDING (COUNT SEVEN A)

"21. During the period from January to March, 1971, Judge McCartney conferred from time to time with his bailiff, Marshal John Fink, at the bench, on the subject of the propriety of his proposed sentencing, immediately prior to his pronouncement of judgment. At Mr. Fink's suggestion to make what they were doing less obvious, Judge McCartney later called his bailiff to the bench, on the pretext of the bailiff's running an errand, before the two would confer. This conduct occurred only with respect to defendants appearing in propria persona.

". . . . . . . . . . . . . ". . . . .

### "FINDING (COUNTS SEVEN B-1 and SEVEN B-2)

"22. On December 10, 1971, Judge McCartney heard a motion by counsel to set aside a guilty plea in the case of *People* v. *Lujan* (. . .), which plea had previously been entered by the defendant in propria persona. Petitioner was called as a witness, was examined by his counsel, was cross-examined by the deputy district attorney, and was also cross-examined extensively by Judge McCartney. At Judge McCartney's direction a San Bernardino police officer was called as a witness for the People. Judge McCartney conducted the examination of this witness during which he ruled on objections by defense counsel to questions propounded by the Court. Judge McCartney then stepped down from the bench, removed his robe, put on his suit jacket, and took the stand as a witness, testifying narratively and at length. At this time there was no judge presiding over the proceedings. Judge McCartney then removed his jacket, put on his robe and resumed the bench.

"Finding No. 18 (Count Six B) is incorporated herein by reference as though set forth in full.

"In both instances, *Lujan* and *Worley,* Judge McCartney became personally involved in the proceedings. His participation was strongly advocative in nature, was clearly directed in support of the prosecution's position, and constituted a partisan effort to defeat petitioner's position. By testifying in an adversary posture he cre-

strongly criticized the pro. per. defendant, alleging that he had previously perpetrated frauds and stating that in an attempt to evoke the court's sympathy, he had brought his children to court. For an apparent misrep-

ated the impression that there was no impartial, truth-seeking judge in the courtroom."

In addition, we adopt with some modification the Commission's Finding 15: While at the bench, Judge McCartney whistled, hummed, and muttered profanities to himself during court sessions. These utterances were made in lower than conversational, but nevertheless audible, tones. The profanity was not directed at any individual or individuals but apparently was almost unwittingly uttered as a personal response to the proceedings. Yet, it was heard by numerous people and the practice continued after the judge had been informed that his comments were within hearing of persons in the courtroom.

[9]The Commission's findings numbered 7, 11, 12, 16, 17, 19, 20, 23, and 26 are rejected for the reason that they are conclusory or duplicative of one of those which we have adopted. Commission findings numbered 6 and 9 are rejected as merely corroborative of finding number 10, involving the judge's heated reaction to the mass filing of affidavit of prejudice forms. Finding number 24 is similarly corroborative of the more explicit findings 18 and 22 as to petitioner's examination of witnesses. Also rejected is the Commission's finding 25, which concerns matters not charged in the accusatory notice and is by its terms merely corroborative of the central findings.

[10]We independently find as follows:

Finding No. 1: During a probation and sentencing hearing in People v. LaCroix, a welfare fraud case, Judge McCartney's examination of the defendant LaCroix was repeatedly interrupted by Mrs. LaCroix' irate and boisterous outbursts. Without shouting, Judge McCartney allowed Mrs. LaCroix briefly to address the court and then firmly admonished her that she would be ordered from the courtroom if she continued to interrupt the proceedings. When Mrs. LaCroix thereafter persisted in her spontaneous outbursts, Judge McCartney—in a voice described by some witnesses as yelling and screaming—angrily told her to "shut up" or he would hold her in contempt. At Mrs. LaCroix' further interruption, Judge McCartney ordered her from the courtroom. As she was leaving, however, Judge McCartney directed her to return to the bench where he found her in contempt of court and ordered her immediate arrest and incarceration in the county jail. In imposing the contempt sentence, Judge McCartney stated to Mrs. LaCroix that she should have proper respect for the court and refrain from "making faces."

After a brief recess during which he rescinded the contempt sentence, Judge McCartney resumed the questioning of the defendant. In the course of reviewing prior instances of his fraudulent conduct, Judge McCartney strongly criticized him for his "cheating attitude," referring to LaCroix as a "deadbeat." He also angrily reprimanded Mr. LaCroix for lying to the court, calling him a "liar" and a "cheat," and for bringing his children into the courtroom as a blatant play upon the court's sympathy. Throughout the resumed proceedings, Mr. LaCroix became progressively hostile to the court, loudly and boisterously interrupting the judge. Judge McCartney reacted by threatening to increase the jail time to 180 days if Mr. LaCroix kept interrupting. Judge McCartney ultimately entered a modified sentence of 30 days in the county jail.

Finding No. 2: In People v. Myers, a driving-while-under-the-influence-of-alcohol case, the defendant entered a guilty plea before Judge McCartney and was sentenced. Before the plea was accepted, Judge McCartney fully advised Myers of his constitutional rights, including his right to enter a plea of not guilty. After adjournment of

resentation to the court, petitioner called the defendant a "liar," "cheat," and "deadbeat." Petitioner also responded to the latter's boisterous interruptions at the sentencing by angrily threatening to triple the jail sentence.

There are three other similar instances. Petitioner told another pro. per. defendant, who had previously appeared before him to plead guilty to a drunk driving charge, to "get in [the] courtroom or I'll have you arrested" when the defendant approached him in the courthouse hallway during the noon recess to casually inquire about the availability of a blood-alcohol test. In hearing a motion for withdrawal of a prior guilty plea in another case, petitioner harassed a defendant and her counsel by extensively examining her as to several irrelevant matters in a furious argumentative "Perry Mason type of dialogue." In a fourth case, where a pro. per. defendant sought the transfer of his case to another court because Judge McCartney seemed emotionally upset, Judge McCartney engaged in a verbal attack upon the defendant with respect to his experience as a paramedic in a deliberate effort to embarrass the defendant or provoke him into a contemptuous response.

There is also clear and convincing evidence that, during the hearing of

---

court for the noon recess, Myers approached Judge McCartney in the courthouse hallway and casually inquired about the availability of a blood alcohol test. Judge McCartney thereupon directed Myers to, "get in this courtroom, or I'll have you arrested." After Myers re-entered the courtroom, Judge McCartney severely reprimanded him for accosting the court in the hallway and continued his case until the afternoon because no reporter was immediately available. In the subsequent proceedings Judge McCartney vacated the plea of guilty over Myers' protests and granted a continuance for the arraignment so that Myers could secure counsel.

Finding No. 3: While hearing an offer of proof in chambers in the case of People v. Worley, Judge McCartney muttered "god damn son-of-a--bitch" under his breath. Although audible to counsel, these utterances were not directed toward any individual.

Finding No. 4: Throughout his harassment of the defendant in People v. Ornelas, Judge McCartney assumed the role of an advocate in attempting to establish that he had treated the defendant fairly when she had previously appeared before him in pro. per. Although counsel was present for both the People and the defendant, the judge extensively questioned the defendant from the bench. Rather than directing inquiry to the material issue of the defendant's understanding of certain waivers she had signed previously in entering a plea, he examined her as to such irrelevant matters as her attitude toward him as a judge and her past conduct of bearing several illegitimate children. Judge McCartney thereby so seriously compromised his impartiality that he was subsequently restrained from proceeding further by the superior court.

Finding No. 5: Judge McCartney has engaged in delays in issuing rulings on numerous occasions. Indeed, he has been observed to routinely sit back in his chair, with his face tilted toward the ceiling and his eyes closed, to contemplate the most ordinary evidentiary objections. At these times, the judge meditated for 3 to 15 minutes at a time while the unrecessed courtroom remained in silence.

the previously mentioned welfare fraud case, petitioner for no apparent reason furiously threatened to hold his court clerk in contempt shouting at her to "Apologize! Apologize!" He subsequently discharged her as his clerk in such a violent manner as to leave her crying at her desk in the courtroom. Following the incident, petitioner went to the office of the supervising assistant clerk of the court. Once there, he loudly demanded "another clerk, right now" while pounding the supervisor's desk with his fist. Petitioner was equally arbitrary with court personnel when sitting at nearby Victorville. There, in the courtroom, petitioner ordered the arrest of a court reporter after the reporter had arranged for a replacement for the afternoon session, had advised petitioner that he had done so, had departed for his annual vacation, and the replacement had arrived 25 minutes later than expected.

The record further includes clear and convincing evidence that almost immediately after petitioner took office the local public defender's office began to file "blanket" affidavits of prejudice against him for reasons that are not entirely apparent. In reaction, Judge McCartney engaged in angry and excited dialogues with deputy public defenders who filed the affidavits. In the course of these arguments, petitioner on one occasion threatened to "fight" the office. In doing so, the judge told one deputy: "I'll meet you anywhere, any time, any place, buddy, up to the United States Supreme Court . . . . You might as well make up your mind to that, mister." On another occasion, Judge McCartney displayed similar hostility to a private defense attorney who attempted to file an arguably untimely affidavit of prejudice.

We find, in addition, clear and convincing evidence that petitioner challenged the transfer of a preliminary hearing on a murder case that was about to commence in his courtroom by calling a recess, taking court personnel and counsel to the presiding judge's chambers and there, in the presence of court personnel and counsel, angrily demanding an explanation for the transfer from the presiding judge.

During an in-chambers offer of proof in a prostitution case, petitioner muttered profanities under his breath in what appeared to be a self-directed, personal emotional release. He has similarly whistled, hummed, and muttered profanities to himself on numerous occasions while at the bench when court has been in session.

The record also contains clear and convincing evidence that petitioner has held benchside conferences with one of his bailiffs in sentencing pro. per. defendants in traffic and misdemeanor cases. The record also discloses, and we deem it a fact, that the court actually imposed some of the sentences which the bailiff fashioned.

Moreover, the judge in several cases extensively examined witnesses—often over objection of counsel—in the manner of an advocate. In conducting such examinations he ruled on counsel's objections to questions which he himself propounded, thereby assuming an adversary posture antithetical to the impartial conduct of court proceedings. These examinations also expended judicial time on matters collateral or entirely irrelevant to the cases before him. While the examination of witnesses by the court was sometimes necessitated by the unavailability of deputy district attorneys,[11] petitioner did not hesitate to engage in such examination even when counsel was present.

In addition, petitioner in at least two cases stepped down from the bench, removed his robe, and took the stand. As a witness he then testified at length in a narrative form, leaving the court without a presiding officer to rule upon objections.

Finally, we find clear and convincing evidence that petitioner, while on the bench, has taken frequent and excessively lengthy unexplained pauses during which he meditated with his eyes closed while the unrecessed courtroom waited in silence. This has occurred before the rulings on ordinary evidentiary objections and other relatively uncomplicated matters.

Viewing the facts as we have found them in their totality, we agree with the Commission that the factual allegations of each of the seven general counts have been sustained "to a reasonable certainty." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 275.) We must, therefore, proceed to decide whether the conduct on petitioner's part which we have found to have occurred constituted "wilful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" within the meaning of California Constitution, article VI, section 18. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 276.) In approaching that question, we are mindful that the decisional law on this subject remains in its infancy. As we observed in *Geiler* v. *Commission on Judicial Qualifications, supra,* the judiciary in this state has fortunately been of such quality that we have been confronted with few censure or removal recommendations from the Commission.

In removing a judge from the bench in the recent decision of *Geiler* v. *Commission on Judicial Qualifications, supra,* this court attempted for the first time to fashion an operable definition of the offenses "wilful miscon-

---

[11]It is unmistakable from the record that throughout 1971 and 1972 the San Bernardino District Attorney's office did not have sufficient personnel to handle all matters upon which the People required representation.

duct" and "conduct prejudicial to the administration of justice . . . ." We there stated that: ". . . the Commission in the instant matter concluded that the conduct proven in the previously discussed specifications constituted 'wilful misconduct in office' and 'conduct prejudicial to the administration of justice that brings the judicial office into desrepute.' As we have noted above, the second ground for imposing discipline was added to the Constitution in 1966. ▪ We believe this mandates our construing 'wilful misconduct in office' as connoting something graver than the 'lesser included offense' of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' The more serious charge should be reserved for injudicious conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied'.to conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only injudicious conduct but conduct prejudicial to public esteem for the judicial office." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at pp. 283-284.) Moreover, we went on to hold that the term "bad faith" was intended to connote that a judge had "intentionally committed acts which he knew or should have known were beyond his lawful power," engaging in a "pervasive course of conduct of overreaching his authority." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 286.)

Applying those principles to the facts of the present case, we are of the opinion that petitioner's angry criticism of public defenders for filing affidavits of prejudice may reasonably be deemed to constitute "wilful misconduct" in office. His threat to "fight" the office was not the only invective hurled at the public defender's office. The judge also branded the affidavit filings a "libel" and "slander" on the court. His remarks were thus obviously volitional. The decisive issue, then, is whether such criticisms were acts which the judge should have known were beyond his lawful authority. We believe there is no question that petitioner overreached his authority and should have known that he was doing so.

▪ It is well recognized that in enacting Code of Civil Procedure section 170.6 the Legislature guaranteed to litigants an extraordinary right to disqualify a judge. The right is "automatic" in the sense that a good faith *belief* in prejudice is alone sufficient, proof of facts showing actual prejudice not being required. (E.g., *Pappa* v. *Superior Court* (1960) 54 Cal.2d 350, 353 [5 Cal.Rptr. 703, 353 P.2d 311]; *Mayr* v. *Superior Court* (1964) 228 Cal.App.2d 60, 63 [39 Cal.Rptr. 240].) Accordingly, the rule has developed that, once an affidavit of prejudice has been filed under section 170.6, the court has no jurisdiction to hold further proceedings in the matter except to inquire into the timeliness of the affidavit or its technical

sufficiency under the statute. (See, e.g., *Andrews* v. *Joint Clerks etc. Committee* (1966) 239 Cal.App.2d 285, 293-299 [48 Cal.Rptr. 646], upholding court's power to inquire as to timeliness; *Lewis* v. *Linn* (1962) 209 Cal. App.2d 394, 399-400 [26 Cal.Rptr. 6], upholding court's power to inquire into sufficiency.) When the affidavit is timely and properly made, immediate disqualification is mandatory. (*Jacobs* v. *Superior Court* (1959) 53 Cal.2d 187, 190 [1 Cal.Rptr. 9, 347 P.2d 9].) Hence, petitioner was bound to accept proper affidavits without further inquiry. A fortiori, his vehement criticism of public defenders for exercising such statutory power was clearly improper. (Cf. *Calhoun* v. *Superior Court* (1958) 51 Cal.2d 257 [331 P.2d 648], holding improper a trial court's striking of a Code Civ. Proc., § 170 statement as a "sham" and "frivolous.") Moreover, the highly personal hostility for the public defender's office which petitioner expressed in doing so was absolutely inappropriate. Precisely the same sort of abuse of position evident in a judge's arbitrary substitutions of counsel met with our condemnation as wilful misconduct in *Geiler*. As this court has noted in respect to the exercise of contempt powers, "[a] judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws . . . ." (*People* ex rel. *Field* v. *Turner* (1850) 1 Cal. 152, 153.)

Equally reprehensible are the repeated and flagrant abdications of judicial functions engaged in by petitioner. These we also deem to be "wilful misconduct" in office. For example, petitioner's benchside sentencing conferences with his bailiff were in clear disregard of the most fundamental concepts of our legal system. By the bailiff's own admissions it was established that he directly participated in the sentencing process by proposing sentences to the court which the court then immediately pronounced upon various pro. per. defendants, and in effect thereby delegated to a nonjudicial officer a power to impose punishment constitutionally vested in the judiciary. He thus deprived the defendants involved of a proper trial in the sentencing stage of the proceedings. (See *In re Lee* (1918) 177 Cal. 690, 693 [171 P. 958].) Such delegations of judicial authority to another, even if for momentary intervals, are unconstitutional and directly run afoul of previous decisions of this court holding very similar delegations of judicial powers to bail bondsmen to be censurable "wilful misconduct." (*In re Chavez* (1973) 9 Cal.3d 846 [109 Cal.Rptr. 79, 512 P.2d 303] and *In re Sanchez* (1973) 9 Cal.3d 844 [109 Cal.Rptr. 78, 512 P.2d 302], both censuring judges for furnishing presigned release orders to local bondsmen.)

Even if the bailiff's suggestions to the judge did not ultimately find their way into the actual sentence imposed, the visual image of the bailiff's active

presence at the bench immediately prior to sentencing undoubtedly carried the appearance that the bailiff had joined in the fashioning of the sentence (excepting, of course, those instances in which the court adopted the unconscionable subterfuge of ostensibly calling the bailiff to the bench to run errands). That appearance of impropriety should have been avoided in light of canons of judicial conduct with which petitioner was most certainly familiar.

As transparently injudicious as his sentencing conferences was Judge McCartney's periodic assumption of the role of an advocate. His extended examinations of witnesses appear to have been particularly destructive of the image of the court as an impartial forum for the determination of truth. Although we appreciate the difficult position into which the San Bernardino judiciary was placed by a shortage of deputy district attorneys at the time, we are compelled by overwhelming evidence to conclude that petitioner's questioning went far beyond the bounds of judicial propriety.

Incident to his duty to conduct proceedings with a view toward the effective ascertainment of truth (Pen. Code, § 1044), a trial judge possesses inherent power to examine witnesses to elicit or clarify testimony (e.g., *People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]). Additionally, we have previously observed that "[t]he mere fact the judge examined . . . at some length does not establish misconduct." (*People* v. *Corrigan* (1957) 48 Cal.2d 551 at p. 559 [310 P.2d 953].) A trial judge may *not*, however, in the course of examining witnesses become an advocate for either party or cast aspersions or ridicule upon a witness. (*People* v. *Rigney, supra*, 55 Cal.2d at p. 241, and cases cited therein.) Moreover, he should properly undertake the examination of witnesses "only when it appears that relevant and material testimony will not be elicited by counsel." (*Id.* at p. 243.) Clearly, these latter limitations have been persistently ignored by petitioner. Perhaps the most flagrant instance was his embarcation in one disturbing-the-peace case upon an argumentative dialogue devoted to a wholly irrelevant inquiry about the testifying defendant's illegitimate children and her attitude toward him as a judge.

Aside from raising such collateral matters in a manner approaching ridicule, the judge directed his inquiry in other cases clearly to support the prosecution's position. Petitioner's calling of witnesses *sua sponte* exhibits the same impropriety. As with examination, a trial court has unquestioned inherent power to call witnesses (Evid. Code, § 775) where the interests of justice require. But that power is subject to a limitation that it be impartially exercised (accord, Law Revision Com. comment to Evid. Code, § 775 [Deering's 1966]) which was clearly exceeded here.

Similarly devoid of proper respect for limitations upon the exercise of judicial power are petitioner's assumptions of the stand as a witness in cases over which he presided. As there is no indication in the record that counsel in those cases objected to his testimony, we may assume that the judge had discretion to testify as provided in Evidence Code section 703, subdivision (d). The judge utterly neglected, however, to comply with the requirement of subdivision (a) of section 703 that he inform counsel of the substance of his impending testimony. Instead, petitioner removed his robe and impulsively stepped from the bench to commence an unexpected discourse. Furthermore, the self-serving and partisan nature of his testimony on each occasion effectively rendered his decision to take the stand an abuse of discretion. As the record indicates, the evidentiary objections to his statements were ruled upon by the judge himself, his narrative form of speaking tended to discourage cross-examination, and his remarks clearly reflected a partisan attitude. These characteristics of judicial testimony are precisely those which Evidence Code section 703 was designed to discourage (see Legislative Committee comment to Evid. Code, § 703.) Additionally, though the subject of this testimony was invariably of marginal relevance, it bore on issues that were more than merely formal or undisputed and was also improper for that reason. (See Wigmore on Evidence, § 1909, at p. 592.)

Examining the remaining incidents which we have found to be established in light of the controlling *Geiler* principles, we further conclude that the conduct which has prejudiced the administration of justice and cast the judicial office into disrepute is petitioner's proven intemperance with court personnel, defendants in criminal cases, and attorneys. The judge's pertinent dialogues were clearly injudicious and undoubtedly damaging to the esteem for the judiciary held by members of the public who observed such conduct. The fact that these volatile outbursts lacked the extreme vulgarity apparent in the court's treatment of counsel and personnel in *Geiler* does not mean that they are any less deserving of our unhesitant reproach. (See, e.g., *People* v. *Black* (1957) 150 Cal.App.2d 494, 499-503 [310 P.2d 472], reversing conviction for judicial misconduct; *Etzel* v. *Rosenbloom* (1948) 83 Cal.App.2d 758, 762-765 [189 P.2d 848], civil judgment reversed for judicial misconduct; see also, the account of the Tenth Circuit Judicial Council's removal of Judge Stephen S. Chandler from the bench in Note, *The Chandler Incident and Problems of Judicial Removal* (1967) 19 Stan.L.Rev. 448 at p. 450, indicating that Judge Chandler (inter alia) singled out one defendant as a "son of a bitch" and others as "shady characters, pirates, and vultures.")

Although we thus conclude that the majority of the formal charges

against petitioner are true and, in those instances we have indicated, are based on acts which constitute either wilful or prejudicial misconduct, we decline to further conclude that other conduct on his part which we have found proven by the evidence is of such character. These other actions we consider less than desirable judicial behavior, but not sufficiently reflective of "bad faith" or a diminution in public esteem to constitute cause for discipline by this court.

The conduct and language engaged in by petitioner which tended to embarrass the other judges in his district is, in our view, repugnant to the venerable tradition that judges share the bench as brethren in a spirit of mutual respect and courtesy. That customary deference was unjustifiably shattered by petitioner's demand for an explanation regarding the transfer of a hearing in connection with a murder case in the presence of lawyers and court attaches. The disrespectful confrontation with the presiding judge was surely an uncalled-for embarrassment to the latter, and most certainly appeared injudicious to observing court personnel and lawyers. Yet, there has been no showing that *public* esteem for the judicial office was substantially impaired by that apparently isolated incident. Hence, the incident could not comprise the lesser offense of prejudicial conduct.

We entertain a similar view with respect to the muttered profanity and humming. We strongly deplore such whistling, humming and swearing as unbecoming, injudicious, and unsuited to the proper decorum of a courtroom. Nevertheless, we somewhat reluctantly find ourselves unable to say in view of all the circumstances that this misconduct was so serious as to rise to the level of an offense or acts warranting removal or censure. The record is unequivocal that petitioner engaged in such conduct unintentionally, indeed almost unconsciously, in low tones and apparently as a matter of emotional release. Unlike the vulgar and profane expletives which we declared a cause for removal in *Geiler,* the profanities uttered here were relatively isolated and were not directed as a reprimand to court personnel, attorneys or any other specific individuals. In essence, the "music" and expletives were apparently "self-utterances" unintended for anyone to hear but the judge himself. Accordingly, while petitioner's utterances might be characterized as erratic and are not to be condoned as proper judicial behavior, they cannot be said to have been "wilful" or to have actually prejudiced the administration of justice in the sense of drawing the courts into public disesteem. (Cf. *Eaton* v. *City of Tulsa* (1974) 415 U.S. 697 [39 L.Ed.2d 693, 94 S.Ct. 1228], holding the isolated usage of street vernacular during a defendant's testimony, not directed to the judge or any officer of the court and not presenting any impairment to the administration of justice, to be an insufficient basis for the imposition of a contempt sentence.)

Somewhat more difficult for us to resolve has been the question whether petitioner's inefficiency in conducting court qualifies as a ground for discipline. Beyond the languor found by the Commission to be attributable to petitioner's frequent silent meditations, the record is replete with clear evidence of chronic delay in his courtroom. As master calendar judge, for example, he habitually ran far behind the normal time schedule in assigning cases and thereby caused such losses of trial time that a backlog of cases for the whole district was increased. Likewise, in handling his own assignments petitioner routinely fell behind schedule: he often failed to complete small claims hearings and custody arraignments during the morning as required by the presiding judge; trials in his courtroom frequently ran into the evening, some as late as midnight; and, law and motion matters which counsel expected to receive summary disposition at the bench became unduly involved proceedings requiring long and arguably unnecessary in-chambers consultations. Not only did this absence of expeditiousness in the dispatch of judicial business place considerable strain on the municipal court calendar, but it also resulted in security, budgetary and manpower problems. Yet, the record is equally clear that this pattern of delay stemmed from no dereliction of duty. Indeed, petitioner has at all times made a conscientious and determined effort to conduct his share of the affairs before the court. ██ Rather than arising from any neglect of responsibility, his inefficiency appears to stem from an effort to attain a degree of diligence and studiousness in the application of the law which was unrealistic and frequently unjustified. Abundantly evident in the testimony of lawyers before the special masters is the opinion that undue caution and excessive attention to detail in all matters before him, even those of minor importance, is at the root of petitioner's inability to conduct court effectively.

On this state of the record, we believe petitioner's inefficiency has not been shown to be so serious as to warrant censure or removal on that ground. Here, the petitioner's shortcomings in the dispatch of judicial business involve no dereliction of responsibility and such shortcomings cannot be condemned as injudicious behavior. In a sense, the image conjured up by petitioner's handling of judicial tasks is somewhat reminiscent of the fog-mired "High Court of Chancery" in Dickens' Bleak House which was so dedicated to the intricacies of "Justice" that the estates probated before it were entirely depleted by court costs and legal fees. That infamous inefficiency, so well depicted by Dickens, was hardly cause for dispensing with the Lord Chancellor. Instead, it became the subject for reform in the Chancery's cumbersome procedures (e.g., Holdsworth, *Bleak House and the Procedure of the Court of Chancery* in Voices in Court (W. Daven-

port ed. 1958) at pp. 363-377). The inefficiency beclouding petitioner's court, we believe, should similarly be dealt with as one of several problems in local court administration. These are by tradition more properly committed for their solution to the sound judgment of the presiding judge of the district (see rule 532.5) rather than to this court in the exercise of its disciplinary powers. Such a result seems particularly appropriate in light of the testimony by his fellow judges, who were generally critical of his penchant for exhaustive detail, that petitioner's excessive care in accepting tendered guilty pleas might be preferred to the more "efficient" summary approval of plea bargains having unconscionable. terms.[12]

Our foregoing conclusions of law, insofar as petitioner is deemed to have engaged in wilful misconduct and conduct prejudicial to the administration of justice, compel us to squarely face the question whether removal or censure is an appropriate sanction. While arguing for an outright dismissal of charges, petitioner also submits that "at worst, [he] should be censured, but not removed" from office. In that connection, he urges this court (inter alia) to excuse his misconduct as an understandable reaction to an improper campaign by public defenders to entirely preclude him from presiding over criminal trials.

We find this "defense" to be a slim reed at best. In the first place, the argument is simply. no answer to petitioner's serious departures from a proper judicial role or his habitual intemperance toward defendants and court personnel. The benchside sentencing conferences with his bailiff, for example, usually took place when no counsel was present. Hence, they were entirely unrelated to any filing of affidavits of prejudice by public defenders.

More reason for rejection of the argument, however, is that it is utterly without exculpatory force even as to petitioner's outbursts at public defenders. It is true, as petitioner asserts, that the record contains some evidence suggesting that the public defender's deputies pursued the filing of affidavits with occasional disrespect to the court. In fact, the entire policy

---

[12]We are also impelled toward the conclusion that a judge should not be disciplined for inefficiency absent proof of dereliction of duty by reference to the impeachment trial of Judge James H. Hardy during the early history of this state. In that case, articles of impeachment charged Judge Hardy, the then "district judge" for Calaveras County, with "causing great delays in the transaction of judicial business" by (inter alia) granting unwarranted continuances and in failing to rule expeditiously on various motions. These charges of inefficiency were dismissed by the state Senate for lack of evidence that the judge wilfully neglected to perform the duties of his office. (Appendix to Journals of Sen. & Assem., No. 36 (13th Sess. 1861-1862).)

itself *may* have been an affront to the court's dignity if it stemmed from public defenders' dissatisfaction with petitioner's "hard line" performance as a district attorney rather than a good faith belief in prejudice.[18] But, even assuming arguendo that the evidence was clear and convincing, disrespect on the part of the public defender cannot serve to justify petitioner's injudicious response. As previously indicated, the Legislature clearly foresaw that the peremptory challenge procedure would be open to such abuses but intended that the affidavits be honored notwithstanding misuse. (See *Johnson* v. *Superior Court* (1958) 50 Cal.2d 693, 697 [329 P.2d 5]; *Mayr* v. *Superior Court, supra,* 228 Cal.App.2d 60, 64.)

Moreover, even if the conduct of the public defenders was clearly contemptuous, petitioner's vehement expressions of personal hostility were

---

[18]Soon after petitioner began his term of office the local public defender established an inter-office policy of filing affidavits of prejudice against him. A written statement requiring affidavits to be filed "on all trials" assigned to petitioner was first circulated within the public defender's office on January 25, 1971. Thereafter, on May 26 and 27, 1971, the policy was expanded to require that, "[an] Affidavit of Prejudice shall be used for all trials, preliminaries, arraignments, bail settings and any other appearances which require an act of judicial discretion." Pursuant to this policy, approximately 205 affidavits were filed by deputy public defenders against petitioner between July of 1971 and March of 1972.

While there is some evidence to suggest that this policy was adopted as part of a concerted effort on the part of public defenders to remove petitioner from the bench, there is an equally strong suggestion that it was rooted in legitimate concerns that the judge would be partial to the prosecution or would take an inordinate amount of time in trying their cases. Accordingly, we are unable to arrive at any definite conclusion about the precise basis for the policy.

The blanket nature of these filings, however, in itself reflects a measure of impropriety. As the objective of a verification is to insure good faith in the averments of a party (e.g., *Hoffman* v. *City of Palm Springs* (1959) 169 Cal.App.2d 645, 648 [337 P.2d 521]), the provision in Code of Civil Procedure section 170.6 for the showing of prejudice by affidavit requires a *good faith* belief in the judge's prejudice on the part of the individual party or counsel filing the affidavit in *each* particular case. (See *Johnson* v. *Superior Court* (1958) 50 Cal.2d 693, at p. 697 [329 P.2d 5], indicating the affidavit of prejudice must be a good faith declaration; accord *Berger* v. *United States* (1921) 255 U.S. 22, at pp. 33-35 [65 L.Ed. 481, at pp. 485-486, 45 S.Ct. 230], holding that substantially similar federal Judicial Code section 21 was satisfied by a *good faith* allegation of prejudice; see generally *Austin* v. *Lambert* (1938) 11 Cal.2d 73 [77 P.2d 849, 115 A.L.R. 849], holding invalid the predecessor section to current 170.6 and emphasizing the need of a provision that would require an averment of prejudice under oath, as required by federal law, in order to insure good faith.) The "blanket" nature of the written directive issued by the public defender arguably contravened this requirement of *good faith* by withdrawing from each deputy the individual decision whether or not to appear before petitioner. To phrase it another way, the office policy predetermined that prejudice would be claimed by each deputy without regard to the facts in each case handled by the office, thereby transforming the representations in each affidavit into bad faith claims of prejudice.

absolutely improper. ■ A judge must not, as previously noted, place the defense of his own character above his obligation to promote respect for the law in adjudicating contempts of court (e.g., *Taylor* v. *Hayes* (1974) 418 U.S. 488 [41 L.Ed.2d 897, 94 S.Ct. 2697], strongly criticizing a district judge for trying a contempt when he exhibited "marked personal feelings' of hostility toward the contemptuous lawyer). If petitioner thus could not vent his personal animosity in the face of contemptuous conduct, he certainly could not do so in the face of any disrespect attendant to the public defender's affidavit of prejudice policy. No matter how provocative are the personal attacks or innuendos by lawyers against a judge, the judge simply "should not himself give vent to personal spleen or respond to a personal grievance" because "justice must satisfy the appearance of justice." (Mr. Justice Frankfurter writing for the court in *Offutt* v. *United States* (1954) 348 U.S. 11, 14 [99 L.Ed. 11, 16, 75 S.Ct. 11]; see also *Cooke* v. *U.S.* (1925) 267 U.S. 517, 539 [69 L.Ed. 767, 775, 45 S.Ct. 390], admonishing judges to "banish the slightest personal impulse to reprisal" in protecting the authority of the court.)

■ We find much more persuasive petitioner's additional argument that the court should be lenient in view of his inexperience on the bench. Unlike Judge Geiler who engaged in misconduct after almost a half-decade on the bench, petitioner had held his office for barely more than a year and a half before he was accused of misconduct. Notwithstanding his many years in the practice of law, he was undoubtedly unfamiliar with some modes of proper judicial behavior necessarily learned only by judicial experience. It is therefore conceivable that some of his prejudicial conduct may have been the product of such ignorance.

Even more salutary, however, was petitioner's unusual care in attempting to "do justice" in the cases before him. In advising criminal defendants of their constitutional rights at arraignment, he took extraordinary measures to insure that defendants understood the procedural protections accorded them. He prepared a detailed arraignment statement, had it translated into other langauges when defendants did not speak English, and added a simple primer of trial procedure for defendants who appeared at trial in pro. per.

At the same time, petitioner strove for fundamental fairness in his sentencing. Where a jail sentence for a minor misdemeanor violation might result in defendant's loss of employment he imposed a weekend sentence. If a fine was to be imposed upon a defendant for whom payment in one sum would be unduly harsh, petitioner often permitted payment by installment deductions from the defendant's weekly salary over a period of time. He was liberal in assigning first-time vehicle offenders to traffic school.

He has also showed unusual initiative in creating opportunities for rehabilitative treatment of alcoholic defendants. He personally established a system whereby the municipal court judges could routinely refer alcoholics to local Alcoholics Anonymous programs and monitored the defendants' participation in rehabilitation. This careful and dedicated approach to even the most minor traffic cases was an admirable contrast to the "assembly-line justice" dispensed by some trial courts which is now drawing increasing public criticism (see Green, Judging the Judges, The Wall Street Journal (March 7, 1974)). Such obvious commitment to fairness and innovative procedural reform on the part of a judge is to be encouraged and may therefore properly be considered by this court in mitigation of proven misconduct when we are called upon by the Commission to fashion a disciplinary sanction.

In apparent deference to these mitigating factors, the masters recommended to the Commission that petitioner only be censured for his conduct prejudicial to the administration of justice in the five instances which they had specified. Their recommendation, as we took care to point out in *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at pages 275-276, is entitled to considerable weight in view of the masters' better position to judge the credibility of the testimony presented to them. We believe the masters' view is especially entitled to that consideration here because the record evinces constructive contributions by petitioner which tend to offset some of the deleterious effects of his misconduct.

 We therefore conclude that the recommendation of the Commission should be rejected, and that censure is the appropriate result. We cannot stress too strongly that were it not for the redeeming qualities which we have mentioned we would be inclined to agree with the Commission's recommendation of removal. But upon our review of the record as a whole we are satisfied that censure is appropriate in this case. Accordingly, we hereby enter an order of censure of Judge James J. McCartney for his injudicious conduct and admonish him to desist from engaging in such misconduct. This order is final forthwith.