**In the Matter of Honorable Tracy L. STORIE, Respondent.**

**No. 60711.**

Supreme Court of Missouri, En Banc.

Dec. 18, 1978.

---

James M. Smith, Sp. Counselor, Commission on Retirement, Removal and Discipline, St. Louis, for Commission.

B. C. Drumm, Jr., Arthur S. Margulis, Wm. P. Grant, Clayton, for respondent.

BARDGETT, Judge.

This is a disciplinary proceeding brought by the Commission on Retirement, Removal and Discipline pursuant to art. 5, sec. 27, Mo.Const., and Rule 12. Respondent is judge of the magistrate court of Pulaski County. The commission found respondent violated the Code of Judicial Conduct (Rule 2) and the statutes of the State of Missouri and recommended that respondent be suspended from office without pay for sixty days. This case is before this court pursuant to art. 5, sec. 27, as amended 1970,[1] and Rule 12.

The facts are not in dispute. Tracy Storie was appointed to fill an unexpired term as Pulaski County magistrate in May 1974, only one month after being admitted to the bar and five months after graduating from law school. He was elected to office the following November and has served as magistrate judge in Pulaski County since that time.

Upon assuming office, respondent observed that the condition of the magistrate courtroom was "a total disgrace to any kind of judicial system". It appears from the record that the courtroom was dilapidated and further that there were no legal reference books or annotated statutes available to the judge, lawyers, or parties before the court. Respondent sought modest funding for improvements in his budget submission to the county court; however, the Pulaski County Court judges (administrative) refused to allow any funds for putting the magistrate courtroom in presentable shape. All

---

1. All references are to Missouri Constitution as amended 1970 unless otherwise noted.

the evidence in this proceeding indicates the magistrate court facilities were a disgrace.

The prosecuting attorney of Pulaski County who was familiar with the conditions of the magistrate court suggested during a plea negotiation in August 1974 a contribution to a "library fund". The defense attorney acquiesced and the concept was presented to respondent who approved the procedure. From the record it appears that the fund accounted for a small percentage of total fines in its four-year period of operation, about one percent. Although the prosecutor and the defense attorney would work out the amount to be contributed in consideration for a reduced charge, dismissal, or a nolle prosequi, without consulting respondent, the procedure had the approval of respondent. The bargain would be presented to respondent for disposition and the contribution would be presented to respondent or his clerk for the "library fund". Respondent would then deposit the proceeds in a bank account and write checks on the account to pay for law books, wages for a parttime court employee, court maintenance and furnishings, as well as insurance on the county bar law library, which included some books loaned by local attorneys to the library. The fund operated from August 1974 through November 1977 during which time the fund accumulated a total of $9,360.34 in contributions. The fund was not secret. Its existence was widely known among the area bar members and others.

On January 4, 1977, the commission sent respondent a letter inquiring about the fund.[2] Respondent promptly replied to the inquiry the following day by letter.[3] There is nothing in the tone or wording of the commission's letter that would indicate a concern that the operation of the library fund was improper. Respondent's reply was truthful, open and candid. It, too, did not indicate any awareness that the procedure may be improper but rather demonstrated a willingness to fully cooperate with the commission.

On September 1, 1977, the commission propounded interrogatories which were answered after one continuance on October 11, 1977. Formal charges were filed by the

2. "Please be advised that the Commission has received information relative to the existence of a library fund in Pulaski County. We have been advised that you are the only person who writes checks on this fund.

"Our information is that a person charged with a state misdemeanor on occasions will be permitted to make a contribution to the library fund rather than pay a fine and court costs.

"The Commission would appreciate receiving your explanation of this fund with particular details as to when the fund originated, who originated the fund, how the library fund operates, how monies from the fund are expended and for what purposes, the amount of money in the fund on January 1, 1977, and any other explanation you deem pertinent concerning this matter.

"The Commission would appreciate having this explanation from you within 10 days from the receipt of this letter."

3. "In response to your letter of January 4, 1977, concerning the Magistrate Court library fund, I am writing to inform you that such a fund does exist in Pulaski County.

"It originated in August, 1974, upon suggestion of the prosecuting attorney of this county and with the consent of this court. The first contributor was a young man who drove a truck for a U. S. Mail hauler. His employer informed him that, if he was convicted of the offense with which he was charged, driving 65 mph in a 55 mph zone, he would lose his job, even though there were no points on his license and this ticket would not have added any. By agreement of the defendant, his attorney, the prosecuting attorney, and this court, the prosecuting attorney nolle prossed the ticket, and the defendant contributed $27.00 to the library fund.

"Every contribution since that time has been made under the same or similar circumstances and with the consent of all parties involved in the action.

"The first expenditure was a down payment on a site of Vernon's Annotated Missouri Statutes for use in the court. Since then, expenditures have been made for a counselor's table, books, etc. Each item has been kept and is being used in the courtroom. If you have any questions concerning expenditures, my bookkeeping may not be perfect, but you may audit or examine the checking account and determine how the monies were expended. I am the only one who deposits money or writes checks on the fund.

"As of January 1, 1977, the amount in the fund was $2029.24.

"If you have any further questions or wish to examine any of our records, please let us know."

commission on November 28, 1977,[4] and the hearing was set for January 4, 1978. On December 19, 1977, respondent filed a motion to dismiss because of lack of notification of the investigation. The motion was denied. On December 27, 1977, a second motion to dismiss was filed alleging that the formal charges did not allege specific violations enunciated in Rule 12.08(a), which was denied. On the date of the hearing, January 4, 1978, a third motion to dismiss was filed alleging that respondent had been deprived of due process and this motion was denied.

The hearing commenced January 4, 1978, and concluded that same day. On March 30, 1978, the commission recommended that respondent be suspended from office without pay for sixty days. Respondent timely objected to the recommendation of the commission to this court.

Initially we consider respondent's procedural contentions. Respondent contends that the notice of the investigation, which is mandatory under Rule 12.08(a), was insufficient as it did not apprise respondent of an investigation nor did the commission prove that the notice was sent by registered or certified mail.

Rule 12.08(a) provides in part: "The judge, magistrate or commission member shall be notified of the investigation, the nature of the information or complaint against him, or that the investigation is on the Commission's own motion, and shall be afforded reasonable opportunity in the course of the investigation to present such matters as he may choose. Such notice shall be given by prepaid registered or certified mail, addressed to the judge, magistrate or commission member at his last known residence."

Respondent does not dispute that he received a letter on January 4, 1977; however, he contends that the letter was insufficient notice in that (1) the letter did not state that an investigation was in progress and (2) there was no suggestion of impropriety. Respondent claims that because of lack of notice he did not have an opportunity during the informal investigation to present material relevant to his defense. Respondent has not aided the court with case law in support of his contention but alleges that "[p]roceedings under Rule 12 are quasi-penal and the Commission ought to be required to strictly comply with those requirements."

■ Absent a showing of prejudice, respondent cannot complain of alleged irregularities in the informal notice. It is generally accepted that Rule 12 is modeled after the California provision for judicial disciplinary proceedings. *In the Matter of Duncan*, 541 S.W.2d 564, 568[4] (Mo. banc 1976); *In the Matter of Fullwood*, 518 S.W.2d 22, 24 (Mo. banc 1975). The Supreme Court of California construed their notice provision, rule 904(b), in a similar challenge in *McCartney v. Commission on Judicial Qualifications*, 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268 (banc 1974), and held 116 Cal. Rptr. at 265, 526 P.2d at 273:

"... In affording a judge 'reasonable opportunity in the course of the preliminary investigation to present such matters as he may choose,' rule 904(b) clearly affords to the judge more procedural protection than is constitutionally required. At the stage of the proceedings to which rule 904(b) applies, the Commission clearly has not yet commenced to perform any adjudicatory function, but is merely attempting to examine citizen complaints in a purely investigatory manner. Accordingly, notice to the judge under investigation as to the nature of the complaints against him is not compelled as a matter of due process. (See *Hannah v. Larche* (1960) 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307.) Hence, relief from the deleterious effect, if any, of the Commission's failure to follow rule 904(b) may be secured by petitioner only upon a showing of actual prejudice."

---

4. There is no explanation as to how or why interrogatories were propounded before formal charges were made, but there is no complaint concerning this procedure.

■ Respondent would urge this court to disregard the California interpretation because of the "quasi-penal" nature of the proceedings. The characterization of removal and disciplinary proceedings as "quasi-penal" ignores the function of the commission. The procedure before the commission is not to punish criminal conduct but rather to maintain standards of judicial fitness. *Matter of Mikesell*, 396 Mich. 517, 243 N.W.2d 86, 90[2] (1976).

■ The respondent was not prejudiced. The contention is overruled. However, in future proceedings, the commission, or its counsel, will be expected to afford a judge notice of the nature of the complaint or matter being investigated in order that the judge can present information to the commission prior to the formal charge. This is in order that, where the commission finds the judge's account of a matter to be such as persuades them that no improprieties occurred, then there will be no formal charge or fewer counts in the formal charge. Rule 12.08(a).

Respondent alleges that the commission failed to comply with the discovery requirements in Rule 12.14 because of the failure of the commission to forward a transcript of an interview with an assistant attorney general and respondent. Respondent contends that because of the commission's failure to furnish the transcript and to affirmatively disclose that all items requested had been furnished, he has possibly been deprived of evidence necessary to the presentation of his defense. This point is not reached because it is respondent's own testimony that forms the basis for the findings and conclusions of the commission as well as this court's findings and conclusions. It is not clear as to what, if anything, respondent did not receive from the commission.

■ The respondent next contends that because of the investigative, prosecutive, and adjudicative functions of the commission he was denied due process of law. Respondent concedes that *Duncan, supra,* holds that "the combination of the investigatory and adjudicatory functions does not violate the strictures of the due process clause." 541 S.W.2d at 568. However, respondent seeks to distinguish *Duncan* because the presenter of evidence was identified as the "legal administrator and special counselor to the Commission" and in that capacity the attorney acted as a prosecutor. The point is overruled. *In the Matter of Duncan, supra.*

■ Respondent's final procedural argument is that the charges contained in the notice of November 28, 1977, do not constitute violations of Rule 12.08(a) or art. 5, sec. 27, of the Missouri constitution. Basically, respondent argues that violations of Rule 2 are not, per se, sufficient to justify disciplinary proceedings absent a violation of specific grounds enumerated in Rule 12.08(a) or art. 5, sec. 27, Mo.Const., which contemplates "gross misconduct". This argument has recently been considered in *Matter of Kohn,* 568 S.W.2d 255 (Mo. banc 1978), where we held at 257:

"... It cannot be seriously questioned that the Code of Judicial Conduct, as well as the Canons of Judicial Ethics, serve as measures for both Commission and Court in judicial disciplinary proceedings and that evidence of judicial conduct in violation of the Canons or Code may be considered in determining whether particular acts complained of rise to the level of misconduct contemplated by Art. V, sec. 27(3)."

Respondent's interpretation would place an unduly restrictive definition on "misconduct" encompassing only those acts which would result in impeachment or removal. The point is overruled.

Respondent alleges that the commission's findings are not supported by the evidence except for count I(d), and the commission exonerated respondent of that charge. However, the evidence of the operation of the library fund came primarily from respondent and his witnesses. The facts are not in dispute.

Counts I(a) through I(e) are merely restated in the conclusions of law with the exception of count I(d). No specific findings appear to relate to the blanket charges

that respondent has violated sections 558.-110 (oppression in office), 558.170 (individual acting as a prosecutor), 556.120 (conspiracy), nor do any of the findings appear to substantiate any inference that respondent has violated the criminal code of this state. Counts I(a) through I(e) also charge that respondent diverted funds as well as subverted the drivers' license "point system". Again, no specific findings support these conclusions of law. We, therefore, dismiss counts I(a) through I(e) as unsupported by the evidence.

■ Count II, as adopted by the Commission in its conclusions of law, states:

"The Commission concludes by the Respondent's activities in connection with the formation of the so-called Library Fund, its maintenance and administration, in such a manner as to appear to be related to the discharge of the judicial functions of his office that he has directly violated the following: that he has given the appearance of impropriety; that he has not maintained and observed the high standards of conduct preserving the integrity and independence of the judiciary; and, that he did not comply with the law and did not conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. The foregoing is in violation of Missouri Supreme Court Rule 2, Canons 1, 2A."

Canon 1, as set forth in Rule 2, provides: "A Judge Should Uphold the Integrity and Independence of the Judiciary."

Canon 2 of Rule 2 provides: "A Judge Should Avoid Impropriety and the Appearance of Impropriety In His Official Activities."

Canon 2A provides: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

We find, by his own admissions, respondent violated the foregoing rules of court. In his brief respondent states: "There is no question that the existence of the fund might have given an appearance of impropriety and that a potential to erode public confidence in the integrity and impartiality of the judiciary existed."

Respondent's statement in his brief is underscored by his attorney's response to questions propounded during oral argument before this court:

"Q. What do you suppose these people that paid the one-thousand dollars or the five-hundred dollars thought they had accomplished with those payments?

"A. Your Honor, I think they thought they bought their way out of it. If you ask me what I think they thought, that would have to be my response. That would be the only conclusion I would reach. We have stated in our brief that there was a possibility of an appearance of impropriety. There is no question in my mind about it, I don't see how we can deny it."

The commission's finding in count II is amply supported by the evidence and admissions of respondent. Although respondent may have acted without an evil intent, the practical effect to the public is that of a "pay-off", not unlike the fact situation in *In re Diener et al.*, 268 Md. 659, 304 A.2d 587 (1973), which involved removal of municipal judges for "ticket-fixing". In that case, even though there was no financial benefit to the judges, the court of appeals removed the judges because of "conduct prejudicial to the administration of justice." *Id.* 594[5].

Although this case is distinguishable from the *Diener* case in some instances, it appears that respondent considered himself a "rubber-stamp" of the prosecutor. We do not feel that this is a proper perspective of judge-prosecuting attorney relationship in acceptance of plea bargaining. Respondent asserts that the "library fund" was but one additional ingredient in the plea bargaining process. We also disagree with this contention. Plea bargaining contemplates a judicial determination of the sentence.

See A.B.A. Minimum Standards for Criminal Justice, secs. 1.8 and 3.3, "Approved Draft, 1968".

Respondent violated Rule 2, Canons 1 and 2A, in that he consented to and participated in the operation of a "library fund" which, from an objective standpoint, gave the appearance that justice was for sale in his court. Respondent has manifested his belief that the "fund" was improper and, coupled with the other circumstances in this case, as well as respondent's cooperation with the commission, we adopt the commission's recommendation of suspension from office without pay for sixty days. This suspension shall apply to respondent for the period designated even though respondent will become an Associate Circuit Judge on January 2, 1979.

Respondent is herewith suspended from the office of Judge of the Magistrate Court of Pulaski County for a period of sixty days without compensation, and the clerk of this court is directed to furnish and deliver certified copies of this opinion and order as provided in Rule 12.26.

All concur.