# In re Justice William C. Hill

[568 A.2d 361]

No. 86-395

Present: Dooley, J., and Barney, C.J. (Ret.), Keyser, J. (Ret.), Springer, D.J. (Ret.), and Ellison, D.J., Specially Assigned

Opinion Filed September 18, 1989

Motion for Reargument Denied September 26, 1989

*Douglas Richards*, Springfield, and *William J. Donahue*, White River Junction, Special Counsel to Judicial Conduct Board.

*Carl H. Lisman* and *Michael Marks* of *Lisman & Lisman*, Burlington, for Justice Hill.

**Per Curiam.** Justice William C. Hill makes timely appeal of an order of recommendation of the Judicial Conduct Board (Board) concluding that he violated the Code of Judicial Conduct in five separate respects. See Rules of Supreme Court for Disciplinary Control of Judges (Rules), Rule 11(2). Special Counsel to the Board responded to Justice Hill's arguments on appeal but also has sought to appeal conclusions of the Board dismissing some of the counts brought by counsel.

On August 13, 1986, in response to certain newspaper articles and media coverage, the Board initiated a preliminary investigation into the possibility of ethical violations by Justice Hill and others. A Special Counsel was retained by the Board to conduct the investigation. See Rules 6(3)(b); 7(2). A formal complaint was filed by Special Counsel on January 16, 1987. See Rule 7(4). The Board ordered a formal hearing on twenty-five counts.

A hearing panel of three members was designated by the Board pursuant to Rule 8(5), and evidence was taken by the panel on March 7 through March 21, 1988. The Special Counsel who conducted the investigation and prepared the Complaint was also designated to present the evidence in support of the Complaint.[1] See Rule 8(7).

The hearing panel conducted hearings on eleven of the counts of the formal complaint that were lodged against Justice Hill. These were counts one, two, three,[2] five, eleven, twelve, sixteen, nineteen, twenty-one, twenty-three, and twenty-four. The panel made extensive findings on March 30, 1988, and recommended that Justice Hill be disciplined on five counts: nineteen, twenty-one, twenty-two, twenty-three, and twenty-four.[3] The Board

---

[1] The Board also retained counsel as a "legal advisor" to the Board in the proceedings.

[2] Special counsel decided not to go forward on this count, and no formal evidence was presented on it. The hearing panel therefore recommended dismissal of this count.

[3] Following is a summary of the counts of the complaint where discipline was recommended by the hearing panel:

**Count 19**

The Count alleged that Justice Hill violated Canons 1, 2A, 2B, 3A(4) and

adopted the hearing panel's findings unanimously. Two Board members filed a separate opinion concluding that part of count five had been proven so that the dismissal of this count by the panel was erroneous. The Board also agreed with the panel's conclusions that in five counts it had been proven that discipline was appropriate for the violations of the Code of Judicial Conduct. The Board declined to recommend a specific sanction.

In addition to the numerous issues on appeal, this Court asked both Justice Hill and Special Counsel to the Board to address whether Special Counsel had standing to argue that the Board committed errors in its final order of recommendation and that more ethical violations should have been found. We address this issue first. We next address the level of scrutiny this Court must apply to the final order of recommendation filed by the Board and whether this Court will proceed de novo by

---

3B(1) of the Code of Judicial Conduct when he signed and personally delivered to the Attorney General a letter expressing concern over the length of a criminal investigation of Assistant Judge Jane Wheel and leaks from an inquest involving this investigation. The panel found a violation of Canon 3A(4).

#### Count 21

The Count alleged that Justice Hill violated Canons 1, 2A, 2B, 3A(3) and 3C(1) by participating in appeal proceedings in *State v. Gordon Hunt* related to the disqualification of Assistant Judge Jane Wheel from sitting in the case. The panel found a violation of Canons 3C(1) and 3A(3).

#### Count 22

The Count alleged that Justice Hill violated Canons 1, 2A, 2B and 3C(1) by participating in the case to decide whether Assistant Judge Jane Wheel should be suspended from acting in a judicial capacity because of criminal charges against her. The panel found violations of Canons 2A and 3C(1).

#### Count 23

This Count alleged that Justice Hill threatened to retaliate against the defense attorney in *State v. Gordon Hunt* in response to the attorney's motion to disqualify him. It alleged this conduct violated Canons 1 and 3A(4). The panel found a violation of Canon 1.

#### Count 24

This Count alleged that Justice Hill violated Canons 1, 2A, 2B and 3C(1) by participating, despite a pending motion to recuse him, in an argument on a motion to remand the case of *State v. Gordon Hunt* to allow the defendant to develop evidence on whether the Supreme Court acted improperly to change the venue in the case to spare embarrassment to Assistant Judge Jane Wheel. The panel found a violation of Canons 2A and 3C(1).

reviewing all of the evidence and making its own determination of facts and law. We then turn to the issues raised by Justice Hill on appeal and to a review of the specific findings and conclusions of the Board where violations of specific Canons of the Code of Judicial Conduct were found.

## I.

### *Right of Special Counsel to Appeal*

Chapter II, section 30, of the Vermont Constitution vests in the Supreme Court "disciplinary authority concerning all judicial officers" in the state. See also Vt. Const. ch. II, § 36 (power to suspend judges). The Legislature has specifically authorized the Supreme Court to "adopt and promulgate a code of judicial ethics" and rules and regulations providing for the exercise of disciplinary control over judges. 4 V.S.A. § 3. The Judicial Conduct Board is established under the Rules of Supreme Court for Disciplinary Control of Judges, and the jurisdiction and powers of the Board flow from these Rules. See Rule 4 (establishment of the Judicial Conduct Board); Rule 3 (jurisdiction).

In concluding that the Special Counsel has no standing to argue as a party opponent to the Board, we review the language of the Rules and review case law from other jurisdictions.

Rule 11(1) provides:

> The Supreme Court shall review all final orders of recommendation of the Board. It may take any action or impose any sanction consistent with its constitutional and statutory authority.

This Court, therefore, has a mandate, in broad terms, to analyze the findings and recommendations of the Board. Rule 11 also provides that the judge charged "may appeal to the Supreme Court from the final order of recommendation of the Board." Rule 11(2). No other party is given authority to take an appeal from a Board recommendation.

Our Rules make clear that Special Counsel is an agent or representative of the Board. Rule 1(3) defines "Special Counsel" as one or more attorneys appointed by the Board to gather and present evidence in proceedings before the Board or this Court. The Board may make independent investigations by its

own members or by Special Counsel. See Rules 6(3)(b); 7(2). Special Counsel may be designated by the Board to present evidence in support of a formal complaint. See Rule 8(7). It is, of course, the Board's complaint that Special Counsel is supporting. See Rule 8(1).

In essence, the result of the proceeding is that the Board narrows its complaint to a limited number of violations of the Code of Judicial Conduct it finds are supported by the evidence. The role of Special Counsel is to present the Board's position to this Court. Nothing in the Rules allow the Board to contradict its own recommendations when its findings and conclusions are being reviewed by this Court and, in effect, argue for greater sanctions than it recommended in its final report.[4] It is axiomatic, therefore, that Special Counsel similarly lacks standing to attack the Board's conclusions and to argue that more violations of the Code of Judicial Conduct should be found and that greater sanctions are appropriate than those recommended by the Board. We therefore hold that Special Counsel does not have standing to appeal from the Board's final order of recommendation. In reaching this conclusion we note that this is the view of a number of other courts.

In *Spruance v. Commission on Judicial Qualifications*, 13 Cal. 3d 778, 532 P.2d 1209, 119 Cal. Rptr. 841 (1975), the Supreme Court of California stated that:

[E]xaminers appear before us merely as counsel to [the Commission]. As such, the examiners are no more free than the Commission itself to argue against the validity of [the Commission's] own adjudication of the facts and consequent conclusions of law. . . . [T]he Commission is estopped from urging us, through counsel, to assess the record otherwise.

---

[4] This is not to say that members of the Board are prohibited from dissenting, in writing, from the conclusions of the full Board, as happened in this case. Where, as here, the dissenting members would find more violations of the Code than the majority, the limit on the power of Special Counsel would also prevent him or her from advocating the views of the dissenting minority.

*Id.* at 785 n.5, 532 P.2d at 1213 n.5, 119 Cal. Rptr. at 845 n.5. This rule was specifically adopted in *In re Buford*, 577 S.W.2d 809, 819–20 (Mo. 1979); *In re Mikesell*, 396 Mich. 517, 526–27, 243 N.W.2d 86, 90 (1976).

The holding in *Spruance* was based upon the language of the California Constitution, which states that "[o]n recommendation of the Commission on Judicial Performance the Supreme Court may . . . censure or remove a judge." Cal. Const., art. VI, § 18(c). Although neither our Constitution nor our statute limits this Court's review in such terms, we have adopted similar constraints in our rules. Thus, Rule 11(1) provides that our role is to "review all final orders of recommendation of the Board." In this context, the failure of the Rules to provide for appeals by the Board or its Special Counsel was intentional. Since our responsibility is to review the recommendations of the Board, it would be inappropriate for the Board or its representative to appeal its own recommendations.

Because we find that Special Counsel may not appeal from the Board's determination, we will review only the findings and recommendations of the Board as appealed by Justice Hill and will not specifically address the issues raised by Special Counsel that attack the conclusions of the Board. Before we turn to the Board's recommendations, however, we must determine the proper scope of review to apply to the recommendations.

## II.

### Standards of Review

Justice Hill argues that this Court, as a Court of original jurisdiction, must proceed with a de novo review of the Board's recommendations and not accord "great weight" to the findings and recommendations of the Board discussed below. He argues further that because in this case the Board committed procedural errors that prejudiced his ability to present his arguments during the preliminary investigation, this Court should not treat the Board's findings with any deference. Special Counsel has taken no position on the correct standard of review but denies that there were any procedural errors.

## A.

Vermont's Constitution vests this Court with "disciplinary authority concerning all judicial officers and attorneys at law in the State." Vt. Const. ch. II, § 30. See also Vt. Const. ch. II, § 37. Our constitutional responsibility is carried out in the first instance through the Judicial Conduct Board, established by Rule 4 of the Rules of Supreme Court for Disciplinary Control of Judges. The Judicial Conduct Board is an arm of this Court, and our analysis of its recommendations is, therefore, different than our review of decisions of lower courts.

In *In re Douglas*, 135 Vt. 585, 586, 382 A.2d 215, 215 (1977), we stated that:

> Since, under Chapter II, Section 30, of the Vermont Constitution this Court has the responsibility for judicial discipline, the recommendations, although for the Court's assistance, must be taken to be advisory only. It is this same concern for constitutional responsibility that requires the Court to examine the evidence from which the findings derive, as well.

(Citation omitted). *Douglas* cites to and applies the reasoning of *In re Harrington*, 134 Vt. 549, 552, 367 A.2d 161, 163 (1976).

*Harrington* involved a disbarred lawyer who petitioned for readmission to the Bar of Vermont and whose petition was denied by the Professional Conduct Board. Although the authority of the Professional Conduct Board is grounded in a different set of rules, its authority derives from similar background as that of the Judicial Conduct Board and the constitutional analysis of its jurisdiction is the same. In *Harrington*, we reasoned that:

> [T]his Court is the true final arbiter in this matter. It is not the function of this Court, in matters of this kind, to "review" actions taken below. The only final and ultimate decision is made here, on the responsibility of this Court. The Professional Conduct Board functions as a collator of the facts and an advisor to the Court, assembling and evaluating the presented material so that it will be in manageable

form for the Court. The findings and recommendations of the Board, both as an arm of the Court and as a body representative of the profession, carry great weight. But they are not binding.

134 Vt. at 552, 367 A.2d at 163 (citing *In re Monaghan*, 126 Vt. 53, 57, 222 A.2d 665, 669 (1966)). In accordance with *Douglas* and *Harrington*, we proceed as the final arbitrator of this case and view the Board's role as advisory, but we accord to its findings and conclusions great weight.

## B.

We apply this standard even though Justice Hill argues that because of procedural errors the Board committed in carrying out its duties we should not give its recommendations "great weight" as we review the record. Justice Hill claims that the Board, and its Special Counsel, committed a number of violations of the Rules. First, Justice Hill argues that the Board ignored the dictates of Rule 7(2) to give him an opportunity to respond intelligently to the informal investigation. Second, he argues that the formal complaint was not verified as required by Rules 1(6), 7(4) and 8(1). Third, he contends that the Board made inappropriate public comments during the course of its investigation. See Rules 6(11), 6(12) and 6(14). Fourth, Justice Hill argues that the Board brought charges that were barred by the appropriate statute of limitations. See Rule 6(19). Fifth, he argues that the Board did not have enough evidence before it to find misconduct by clear and convincing evidence. Rule 9(3). Because of these alleged violations, Justice Hill argues that this Court should not treat the Board's findings and conclusions with much, if any, deference. We address these arguments in order.

## 1.

Rule 7(2) provides:

> If the Board or Court orders a preliminary investigation, the Board shall make an investigation forthwith . . . . *The Board shall give the judge in question an opportunity to*

respond. The Board may engage special counsel or others to carry out a preliminary investigation.

(emphasis supplied). Rule 7(1) provides, in part:

> Upon . . . its own motion . . . the Board shall order or make an initial inquiry, as may be appropriate, to determine whether sufficient cause exists to proceed to a preliminary investigation. The Board shall send a copy of . . . its motion to the judge and inform him that an initial inquiry is being undertaken.

The right of the judge to respond allows for expeditious resolution of frivolous or patently unmeritorious complaints. The right also serves to protect judges from publication of frivolous or unwarranted charges and to maintain confidence in the courts by avoiding premature disclosure of groundless claims. See *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 835 (1978). One commentator has noted that more than 75% of the complaints filed against judges are dismissed without formal adjudication. Sharman & Begue, *Silence Isn't Always Golden: Reassessing Confidentiality in the Judicial Disciplinary Process*, 58 Temp. L.Q. 755, 762 n.45 (1985) (citation omitted).

The Code of Judicial Conduct holds members of the judiciary to an extremely high standard of conduct. As has been noted, "[m]any violations of the code of judicial conduct would not constitute . . . any impropriety for a legislative or executive officer." Overton, *Grounds for Judicial Discipline in the Context of Judicial Disciplinary Commissions*, 54 Chi.[-]Kent L. Rev. 59, 59 (1977) (footnotes omitted); see also Buckley, *The Commission on Judicial Qualifications: An Attempt to Deal with Judicial Misconduct*, 3 U.S.F. L. Rev. 244, 253–55 (1969). To place all alleged violations of the very strict standards of judicial conduct in the public light at an early stage, before the Board has evaluated the veracity of the complaints and before the accused judge has had an opportunity to respond, would be fundamentally unfair to the judge involved and may undermine the independent, and sometimes controversial, decisions that judges must make.

The events in this case are not fully developed in the record. After the Board commenced its preliminary investigation in August of 1986, counsel for Justice Hill wrote Special Counsel offering to "cooperate with the Board" and asking to be "informed of the specific alleged acts of misconduct that have been made against [Justice Hill]" in order "to properly exercise his opportunity to respond." Special Counsel responded that he appreciated Justice Hill's willingness to cooperate and that no formal charges have yet been brought. Apparently, Special Counsel interviewed Justice Hill in December but did not ask about a number of the charges that ended up in the January, 1987 complaint, and Justice Hill did not touch on these issues.[5] Justice Hill alleges a violation of Rule 7(2) from these facts.

We recognize that Special Counsel was in an ambiguous position because there was no third-party complaint and he was investigating allegations made mainly in the press. Thus, there were no "specific alleged acts of misconduct" before the Board itself filed its complaint. We think, however, that the record shows that Rule 7(2) was not fully complied with. The interview occurred relatively close in time to the filing of the complaint and three months after the start of the investigation. It is likely that Special Counsel could have given Justice Hill an opportunity to respond to all of the charges that ended up in the complaint. If matters came up after the initial interview, a second interview could have been offered.

Although the record supports a violation of Rule 7(2) and we share Justice Hill's position that failure to comply with Rule 7(2) undermines the integrity of the process, we cannot find prejudice to Justice Hill in this case. The primary purpose of the Rule is to protect judges against public adjudication of wholly unfounded claims.

The Board decided that a formal investigation was mandated by the information obtained during the preliminary investigation. At this later stage of the proceedings, it is clear that the Board would have proceeded even if Justice Hill had privately

---

[5] We do not have a transcript of this interview so we do not know its full contents.

responded to each and every allegation. Thus, the denial of the right to respond did not affect the outcome of the preliminary investigation.

A number of courts have faced similar procedural defects in judicial conduct investigations and decided that they did not warrant rejection of the Board's findings and conclusions. In *McCartney v. Commission on Judicial Qualifications*, 12 Cal. 3d 512, 519, 526 P.2d 268, 273, 116 Cal. Rptr. 260, 265 (1974), the California Supreme Court rejected an argument that the failure to afford the judge involved an opportunity to "present such matters as he may choose" as required by Commission rules required dismissal of the proceeding because the judge was denied due process of law. The Court held that any relief for violating the rule must depend "upon a showing of actual prejudice" and none appeared because the judge eventually got actual notice of the charges and a reasonable time to prepare a defense. *Id. McCartney* was followed in *In re Storie*, 574 S.W.2d 369, 373 (Mo. 1978), where the judge was not allowed to complain of a showing of investigation procedural irregularities "[a]bsent a showing of prejudice." *Id.* at 372. More recently, a similar issue was dealt with by the Minnesota Supreme Court in *In re Kirby*, 354 N.W.2d 410, 416–17 (Minn. 1984). The Court in *Kirby* was highly critical of the disciplinary board for failing to give the judge involved an opportunity to respond to each allegation prior to their being made public. Nevertheless, the Court held that the omission was not so detrimental "to raise the concern that fundamental fairness may not have attached" and upheld the board on the merits. *Id.* at 416.

As in the above cases, Justice Hill received full notice of the charges and an opportunity to respond after the complaint was filed against him. Since the denial of an opportunity to respond during a preliminary investigation did not affect the outcome, we do not see how we can give the Board's findings and conclusions any less weight. The argued-for remedy is inappropriate for the asserted wrong.

2.

█ Justice Hill's second procedural argument is that the complaint against him was not verified and did not state that the Board found probable cause on each count. Justice Hill argues that the Rules require this level of formality. See Rules 1(6), 7(4). Because the Rules use the word complaint in two ways—both as a communication received by the Board "concerning alleged acts of misconduct or disability," Rule 1(4), and as a document filed by the Board to begin the "Formal Hearing," Rule 7(1)—it is unclear whether the Board's complaint needs to be verified. We see no need for the Board, or its agent here the Special Counsel, to verify the complaint. Accordingly, we interpret the Rules as not requiring the Board to verify its formal complaint. See, e.g., *In re Murphy*, 726 S.W.2d 509, 513 (Tenn. 1987). Nor do we find any requirement that the complaint recite the finding of probable cause. As Special Counsel has pointed out, the Board has not historically verified its formal complaints. There is no error in the failure of the Board to verify the complaint or in the failure to state that it found probable cause or to recite its finding of probable cause.

3.

Appellant also argues that members of the Board committed prejudicial error in making various comments to the press. The record is not clear on this claim. Following the filing of the complaint, Justice Hill moved to dismiss the complaint and disqualify the Board, alleging that the Board had breached the confidentiality of the preliminary investigation. See Rule 6(7). Press accounts were attached to the motion. These centered on newspaper stories quoting the chairman of the Board.[6]

Special Counsel responds that the Board was allowed to make a statement under Rule 6(14) because the subject matter

---

[6] The motion indicated that Justice Hill would undertake prehearing discovery on further violations of confidentiality. We have no indication of the results of this discovery, if it occurred. Justice Hill's brief also refers to a March, 1987 press account of an interview with the Board chairman, but this occurred after the complaint was filed when the proceedings were public. See Rule 6(15).

had become public "through independent sources." This Rule allows the Board to "issue statements as it deems appropriate" for four purposes, including confirming the pendency of the investigation and clarifying the procedural aspects of the disciplinary proceedings.

While some of the reported statements of the chairman pushed the outer limits of Rule 6(14), we think that taken as a whole they were within the exception to confidentiality. The reports stressed that the Board was at a very preliminary stage— "only an 'inquiry' "—and would go further only if its investigation showed possible misconduct.

We have recently discussed this standard for disclosure in *Herald Association, Inc. v. Judicial Conduct Board,* 149 Vt. 233, 241, 544 A.2d 596, 601 (1988). In that case we noted that Vermont holds confidential "complaints, and investigations of such complaints, unless they result in formal charges. Denial of public access to this stage protects 'judges from the injury which might result from publication of unexamined and unwarranted complaints.' " *Id.* (quoting *Landmark Communications, Inc. v. Virginia,* 435 U.S. at 835).

■ This investigation was conducted, through no fault of the Board, in full light of the press. The story of possible ethical violations by members of the judiciary was prevalent in Vermont news stories before, during and after the Board's investigation. The statements by the chairman of the Board did not publicize "unexamined and unwarranted complaints." All they did was confirm that the Board was investigating allegations widely reported in the press. Thus, we cannot find a violation of the confidentiality provisions of the Rules on the record before us. Further, we cannot see how the press coverage prejudiced Justice Hill either during the investigation or after the complaint was filed. See, e.g., *Council on Probate Judicial Conduct re Kinsella,* 193 Conn. 180, 202, 476 A.2d 1041, 1054 (1984) (no authority exists to preclude an orderly investigation of judicial misconduct due to an unauthorized disclosure of the recommendation of censure or because of prior adverse public comment); *Roberts v. Commission on Judicial Performance,* 33 Cal. 3d

739, 751, 661 P.2d 1064, 1071, 190 Cal. Rptr. 910, 917 (1983) (improper disclosure would not "excuse petitioner's misconduct").

### 4.

Justice Hill's last argument that the Board and Special Counsel prejudiced him through their failure to adhere to procedures is that some of the counts were clearly barred by the three-year statute of limitation contained in Rule 6(19)(a). The counts specified were dismissed by the Board on other grounds. Special Counsel argues that the counts related to a "pattern of recurring judicial conduct" where the last episode was within the three-year period and thus were allowable under a specific exception to the three-year limitation period set out in Rule 6(19)(a). Special Counsel appears to have the better part of this argument but, in any event, we fail to see how Justice Hill was prejudiced since the counts were dismissed.

■  For the above reasons, we see no reason why we should not give deference to the findings of the Board. We now turn to a review of the evidence and record below and the recommendations of the Board as raised by Justice Hill. We apply a clear and convincing standard to the evidence in determining whether there are violations of the Code of Judicial Conduct. Rule 9(3) ("The Board shall rely only on the record in reaching its final order of recommendation, which . . . shall be founded on clear and convincing evidence."); see also Overton, *supra*, at 63 ("The standard of proof which is used by most commissions in finding judicial misconduct, and by state supreme courts in their independent review of the evidence before the commission, is that the evidence of misconduct must be 'clear and convincing.' ") (footnotes omitted). On each of the violations found by the Board, we have been guided by the Board's findings, but we have independently reviewed the evidence and made our own findings.

### III.

### *The Facts*

The Judicial Conduct Board's designated hearing panel heard evidence from March 7 through March 21, 1988. The

panel issued a disposition report on March 30, 1988, ruling on eleven counts. The hearing panel recommended that Justice Hill be found to have violated the Code of Judicial Conduct in five of the counts.

The Judicial Conduct Board reviewed the report of the panel and adopted the findings of fact unanimously, applying a clear and convincing standard to the evidence. All members of the Board agreed with the panel that Justice Hill had violated Canons 1, 2A, 3A(3), 3A(4), and 3C(1) of the Code of Judicial Conduct.[7] In a concurring and dissenting opinion, two Board

---

[7] The Code of Judicial Conduct was adopted by this Court in Administrative Order Number 10. The Canons are " 'standards measuring fitness for judicial office and therefore embrace tests of behavior relating to integrity and propriety that condemn actions in which the average citizen can freely indulge without consequence.' " *In re Mandeville*, 144 Vt. 608, 609, 481 A.2d 1048, 1049 (1984) (quoting *In re Douglas*, 135 Vt. 585, 592, 382 A.2d 215, 219 (1977)).

The Canons at issue in the case at bar are:

Canon 1. A judge should uphold the integrity and independence of the judiciary

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2. A judge should avoid impropriety and the appearance of impropriety in all his activities

A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary

Canon 3. A judge should perform the duties of his office impartially and diligently

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. *Adjudicative Responsibilities.*

. . . .

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity . . . .

members disagreed with the hearing panel and argued that the evidence also showed a violation of Canon 2B.[8] Justice Hill argues before this Court, as he did before the Board, that the evidence disclosed no violation of any Canon of the Code of Judicial Conduct. We will review only the counts of the formal complaint against Justice Hill where violation of the Canons were found.[9] After a statement of the facts we discuss each Canon upon which a violation was premised, rather than discuss each count.

On its own motion the Judicial Conduct Board began an investigation of Justice Hill pursuant to Rule 6(6). This investigation was triggered by press reports of professional misconduct by Justice Hill and others occasioned by his close association with Assistant Judge Jane Wheel. The foundation of these charges was allegations that Chittenden County Assistant Judge Jane Wheel had direct access to Justice Hill and was using this access to influence the Court on cases before it and on administrative matters.

The facts show that Justice Hill knew and worked with Judge Wheel beginning in November or December of 1974, when Ms. Wheel was first elected as an assistant judge in Chittenden County and when Justice Hill was a superior judge in Chittenden Superior Court. At some time during 1975, deputy clerk of the Chittenden Superior Court, Margaret Maskell, grew concerned about comments and questions made by then Assistant Judge Wheel to members of the staff. These comments related to (then Judge) Justice Hill's good looks, and the questions re-

---

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. . . .

. . . .

C. *Disqualification.*

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . .

[8] Canon 2B provides in part:

A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him.

[9] These are counts 19, 21, 22, 23, and 24.

lated to his personal life. Mrs. Maskell was concerned enough about these comments that she told Justice Hill about them and warned Justice Hill that such comments could prove damaging to him. The comments by Judge Wheel stopped.

Justice Hill and Judge Wheel worked on various judicial system issues throughout the years they both served in the Judiciary. Justice Hill and Judge Wheel—as is common and encouraged within the Judiciary—occasionally associated socially as well as professionally. The staff and judges of the superior court would lunch together and Justice Hill, now on the Supreme Court, would join these lunches when in Burlington. Conversations at these gatherings sometimes related to court affairs. Justice Hill's position as liaison with the Chittenden Superior Court led him to visit the court often. Justice Hill and Judge Wheel served together on the Committee on Court Facilities, and they frequently discussed business together. Judge Wheel called Justice Hill often. Justice Hill, Justice Hayes, and Judge Wheel met frequently on Friday nights at the Holiday Inn in Burlington for drinks.

The facts show that Judge Wheel attempted to use her association with Justice Hill to further her resolution of administrative problems at the superior court. Although these attempts did not meet with success, Judge Wheel bragged of her association with Justice Hill and other members of this Court as a means to impose her view of administrative matters on others in the judicial system. Judge Wheel's actions were commonly known by the summer of 1985. The facts show that Judge Wheel was a competitive and political member of the court system.

Gordon Hunt was charged in 1982 in the Chittenden Superior Court with murder. Then Superior Court Judge James Morse was the presiding judge in the Chittenden Superior Court. A plea agreement between the State and defendant Gordon Hunt was accepted by Judge Morse but not by the Assistant Judges Wheel and Delaney. Since two-thirds of the court had refused to accept the plea agreement, it was not effective. Defendant sought and obtained an interlocutory appeal to this Court to challenge the power of assistant judges to overrule the presid-

ing judge and disapprove plea agreements. Both the State and defendant argued that assistant judges lacked the authority to reject a plea agreement.

Judge Wheel, as then-President of the Assistant Judges Association, retained counsel to write an amicus brief in support of the power of assistant judges. Judge Wheel attempted to solicit the Attorney General to join the assistant judges' position as amicus curiae, promising political help to the Attorney General in future elections if he granted the request. The Attorney General refused to take the requested position since the Office would then be taking an adversarial position to a state's attorney even though both represented the State. This Court, with Justice Hill in the majority, issued an opinion in May, 1984, supporting the authority of assistant judges to reject plea agreements. See *State v. Hunt*, 145 Vt. 34, 485 A.2d 109 (1984). Following this Court's decision on the power of assistant judges, defendant moved to disqualify the assistant judges based upon Judge Wheel's attempt to persuade the Attorney General to file an amicus brief in support of the assistant judges. Judge Morse presided and issued an opinion and order deciding that Judge Wheel should be disqualified from further participation in the case.

Judge Wheel filed a motion for extraordinary relief with Justice Hill, as Chittenden Superior Court liaison. Justice Hill granted Judge Wheel's request for a stay of the disqualification pending resolution of her motion, and he hand delivered this Entry Order to the Chittenden Superior Court. Thereafter, Frank Fee, Chittenden County Clerk, suggested to Judge Morse that he should transfer the Hunt case to another county to avoid the controversy. Clerk Fee indicated that the suggestion came from Justice Hill.

On January 3, 1985, without hearing and without notice to the parties, the full Supreme Court issued an order vacating the Opinion and Order of Judge Morse, declared the Wheel petition moot and transferred the Hunt prosecution to Lamoille Superior Court. Defendant's motions for reconsideration and to be

heard on the questions involved were denied by the Court by a vote of four to one, with Justice Hill in the majority.[10]

Between April and November of 1985, the two Chittenden County assistant judges, Wheel and Delaney, stopped speaking to each other. In April of 1985, Judge Wheel stopped speaking to Clerk Fee because Clerk Fee went to lunch with a retired Justice of this Court who Judge Wheel felt was not fully supportive of the judicial powers of assistant judges. In June of 1985, Judge Wheel began secretly to review Assistant Judge Delaney's pay vouchers in an attempt to find an impropriety. Judge Delaney discovered this and began submitting his pay vouchers directly to the Court Administrator in Montpelier. Judge Wheel began requesting that a deputy clerk retrieve these pay vouchers from the Court Administrator. Justice Hill, apparently at Judge Wheel's request, had his secretary review Judge Delaney's pay vouchers.

Morale sank to an all time low in the Chittenden Superior Court. This Court was aware of the problems in the superior court through complaints by lawyers filed with the Chief Justice. The Supreme Court became involved directly in attempting to correct the administrative and morale problems at the Chittenden Superior Court. Justice Hill was involved in these efforts through the fall of 1985.

The Attorney General wrote the Chief Justice on November 20, 1985, that his office was investigating Judge Jane Wheel based upon allegations of improper conduct. This investigation was reported in the press. It involved, among other matters, an allegation that Judge Wheel had misused county funds to pay for a party for Justice Thomas Hayes when he was appointed to the Supreme Court from the superior court. The Supreme Court held an administrative meeting on February 6, 1986, and the Court decided that the Court Administrator's office should

---

[10] Gordon Hunt was eventually convicted after a jury trial and argued in this Court that the change of venue denied him a fair trial. Describing the situation that gave rise to the change of venue as "both extraordinary and unusual," we upheld the change of venue as within our supervisory authority and, in any event, found no prejudice to defendant. *State v. Hunt*, 150 Vt. 483, 487–91, 555 A.2d 369, 372–74 (1988). Judge Valente dissented on this point.

thoroughly investigate the situation at the Chittenden Superior Court. Justice Hill began the discussion at that meeting by requesting that the Court Administrator's representative check into the records of the Chittenden Court to see if there were irregularities. During that meeting, Justice Peck stated he would not participate in a witch hunt, alluding to what he perceived as an attempt by Justice Hill to pin the problems at that court on Clerk Frank Fee. The Chief Justice testified that he stated at the meeting with the Court, "I would not be a party to sending Lee [Suskin of the Court Administrator's office] over to make a defense for Jane Wheel." The Chief Justice made this comment because he perceived the remarks of Justice Hill to be directed at the events that had occurred at the Chittenden Superior Court pertaining to Jane Wheel, not to be directed at that court's current problems.

In May of 1986, Justice Hill initiated a conversation among Justices of the Supreme Court as to whether the Attorney General should be required to come before the Supreme Court to explain what Justice Hill perceived to be a delay in the investigation of Judge Wheel and to explain leaks to the press from an inquest. The full Court met in Chambers and, following discussion, Justice Hill moved that the Attorney General be called over to the Court. Justice Hayes seconded the motion. The rest of the Court opposed the motion, and the meeting adjourned when Justice Hayes stormed out in anger.

As a compromise to calling the Attorney General before the Court, the Chief Justice recommended that a letter be drafted and mailed to the Attorney General expressing concern about the time it was taking to conclude the investigation. The purpose of this letter was to avoid a confrontation and a face-to-face meeting. The letter was drafted by the Chief Justice with changes being made by Justice Peck and Justice Hill. Because the Chief Justice was unavailable, the letter was signed for the full Court by Justice Hill. Justice Hill decided to hand deliver the letter to the Attorney General. He then stayed in the Attorney General's office while the letter was read. The Attorney General told Justice Hill that he would respond in writing.

By the summer of 1986, the press was reporting the involvement of members of this Court, including Justice Hill, in improper conduct with respect to the investigation of Judge Wheel. During that same summer, an appeal of Gordon Hunt's conviction was before the Court. On September 8, 1986, the Court heard a motion brought by the Attorney General's office seeking a partial withdrawal of the Attorney General's office from the Hunt appeal. This motion was made because of the involvement of the Attorney General's office in the investigation of Judge Wheel. The public defender representing Gordon Hunt indicated that he viewed participation by the Attorney General in the case as a violation of the Code of Professional Responsibility because of a conflict of interest. The defender urged that the Attorney General's office move to withdraw, stating that if the Attorney General's office refused to do so, the defender would move for disqualification. Ultimately, the motion was filed by the Attorney General. As filed, the motion presented a compromise from the position originally taken by the Defender General since it allowed some limited involvement by the Attorney General in the case. The compromise concerned the Court sitting to hear the motion. Neither counsel, before presenting the compromise to the Court, considered consulting the Vermont Bar Association Professional Responsibility Committee for a ruling on its propriety.

Justice Hill was a member of the Court that heard the motion on September 8.[11] During that hearing, Justice Hill engaged in close questioning of both the attorney for the State and for the defendant. Justice Hill's questioning did not anticipate answers but seemed designed to intimidate the litigants and to question their motives, not their decision, in negotiating a settlement of the ethical issue. Justice Hill repeatedly interrupted both counsel from the Attorney General's office and counsel from the Defender General's office. The hearing panel found that "his questions were argumentative in tone in that he repeatedly

[11] One of the members of the Court in this proceeding also sat and heard the motion. We do not think that is significant because all members of this Court have heard a tape of the argument in reviewing the evidence in this case.

asked questions of the attorneys but cut them off when they attempted to answer." Justice Hill himself mentioned the possible impropriety of his participation in the motion decision.

One of the participants at the hearing testified that Justice Hill sat at the edge of his seat and was red in the face. Chief Justice Allen testified that Justice Hill's questioning was "very uncharacteristic, . . . very intense . . . accusatory in some aspects." Justice Peck testified that it was the strongest judicial questioning he had ever heard.

On November 18, 1986, Justice Hill had a social lunch with the then Defender General, David Curtis. During this lunch Justice Hill asked Mr. Curtis whether another attorney in the Defender General's office was still angry with him. According to Mr. Curtis' testimony, that question was in reference to the September 8, 1986 hearing in the *Hunt* case, discussed just above. Mr. Curtis replied that although the attorney was not angry, his office might be filing motions in the matter. Justice Hill responded that he, too, may be filing some motions.

Mr. Curtis believed at the time that Justice Hill was referring to the possibility that he might file professional conduct complaints against a member of the Defender General's staff. Mr. Curtis at that point broke off the conversation. The next day Justice Hill called Mr. Curtis to make certain that he understood the comments at the luncheon were meant to be facetious. Mr. Curtis testified that, based on his longstanding friendship with Justice Hill, he believed the comment was meant as a joke.

### IV.

#### The Code of Judicial Conduct

Before reviewing the specific violations found by the Board, we emphasize the high standard of conduct set by the Code of Judicial Conduct. As the Michigan Supreme Court recently emphasized:

> A judge, at any level of the court system, presides at the focal point of the administration of justice. For that reason, a judge must be held to the highest standard of any public official.

*In re Callanan,* 419 Mich. 376, 386, 355 N.W.2d 69, 73 (1984). See also *In re Romero,* 100 N.M. 180, 183, 668 P.2d 296, 299 (1983) ("The conduct prescribed for judges and justices is more stringent than conduct generally imposed on other public officials."). Not only must judges be impartial but also a judge must "conduct himself in such a way that the public can perceive and continue to rely upon the impartiality of those who have been chosen to pass judgment on legal matters involving their lives, liberty and property." *Sardino v. State Commission on Judicial Conduct,* 58 N.Y.2d 286, 290–91, 448 N.E.2d 83, 85, 461 N.Y.S.2d 229, 231 (1983).

The reach of the Code goes beyond the professional affairs of judges and into their nonjudicial lives. A judge can never avoid the prestige and authority of the office he or she holds. That prestige and authority, however, may not be used to enhance personal relationships, or for selfish reasons, or to bestow favors. See *In re Sims,* 61 N.Y.2d 349, 358, 462 N.E.2d 370, 375, 474 N.Y.S.2d 270, 275 (1984).

## A. Canon 1

The Board found that Justice Hill violated Canon 1 of the Code of Judicial Conduct when he threatened to retaliate against the public defender for filing a motion to disqualify him. Canon 1 requires that a member of the judiciary set the highest standards of conduct "so that the integrity and independence of the judiciary may be preserved."

The Board failed to resolve whether the luncheon comments to Defender General Curtis were made facetiously, as interpreted by the Defender General, finding that even if facetiously made they violated Canon 1. Because violations must be proved by clear and convincing evidence, we believe that we must find that the comments were made facetiously. We do not believe that one isolated incident of facetious conduct between friends violated Canon 1, even in the charged atmosphere that developed during the various investigations being conducted at that time. Realizing the "appearance" of his act, Justice Hill clarified his statement the next day. We do not find that the

evidence discloses a violation of Canon 1 at the lunch meeting between Justice Hill and the Defender General.

## B. Canon 2A

Canon 2A states that "[a] judge should . . . conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The Board concluded that, by the summer of 1986, Justice Hill's continued involvement in judicial proceedings in which Judge Wheel had an interest violated his duty to " 'promote' public confidence in the judiciary." The Board concluded that "[t]he integrity and independence of the judiciary is of utmost importance to the public and judges must maintain the highest standards of conduct so that the public perceives them as fair and unbiased. Someone with Justice Hill's lengthy judicial experience should have been sensitive to the public's perception of his actions."

The perception of Justice Hill's actions referred to by the Board stems from Justice Hill's association with then Assistant Judge Wheel and his continued involvement in Supreme Court business involving Judge Wheel. Despite continued publicity and public perceptions of impropriety, Justice Hill did not recuse himself on matters involving Judge Wheel until the time when the Judicial Conduct Board brought a formal complaint against him.

On September 8, 1986, Justice Hill participated in the oral argument of the Attorney General's motion to withdraw in part from the Hunt case. Each member of this Court has listened to the tape of that hearing. It is apparent to us from Justice Hill's actions at that hearing, particularly the nature and tone of the questioning and the constant interrupting of counsel, that he was motivated by his anger over the treatment of Judge Wheel and the hypocrisy he perceived in counsel's action. By September 8, Justice Hill could no longer act objectively and impartially on matters involving Judge Wheel. The press accounts of the September 8 hearing made clear to the public that Justice Hill no longer had the objectivity to sit on matters involving Judge Wheel.

On October 6, 1986, this Court heard argument in connection with the suspension of Judge Wheel. Despite his lack of objec-

tivity, Justice Hill participated in the October 6 argument in connection with the suspension of Judge Wheel and in the decision to suspend Judge Wheel with pay. On December 10, 1986, a motion for limited remand was filed in the Hunt case. The attorney specifically moved that Justices Hill, Hayes and Gibson recuse themselves. Justice Hill refused to disqualify himself and participated in the argument.

We agree with the Board that Justice Hill's failure to disqualify himself from all matters involving Judge Wheel by the summer of 1986,[12] and his participation and demeanor during the hearing on September 8, 1986, constitute a violation of Canon 2A of the Code of Judicial Conduct. This conclusion is supported by clear and convincing evidence.

### C. Canon 3A(3)

The Board found that Justice Hill violated Canon 3A(3) by engaging in hard questioning during the September 8, 1986, hearing. Canon 3A(3) requires a judge to be "patient, dignified, and courteous to . . . lawyers . . . with whom he deals in his official capacity." The Board concluded that Justice Hill's demeanor and manner of questioning was impatient and discourteous. The line between hard and provocative questioning and impatience and discourtesy is difficult to draw in an institution built on lively intellectual and adversarial debate.[13] Canon 3A(3) is designed to prevent a lack of decorum during the discharge of judicial responsibilities. See, e.g., *In re Crowell*, 379 So. 2d 107, 109–10 (Fla. 1979); *In re Dwyer*, 223 Kan. 72, 74–76, 572 P.2d 898, 900–01 (1977); *In re Donohue*, 390 Mass. 514, 518–19, 458 N.E.2d 323, 326 (1983). Tough questioning does not gen-

---

12

   [T]he ultimate test is whether the judge can decide the case impartially and without bias . . . . "[I]f the slightest question exists, all doubts should be resolved" in favor of disqualification. We interpret this standard to require the disqualification of a judge whenever a doubt of impartiality would exist in the mind of a reasonable, disinterested observer.

   *Richard v. Richard*, 146 Vt. 286, 287–88, 501 A.2d 1190, 1191 (1985) (quoting *Condosta v. Condosta*, 137 Vt. 35, 36, 401 A.2d 897, 898 (1979)).

[13] We note with approval Justice Hill's citation to Frankfurter & Landis, *The Business of the Supreme Court at October Term, 1931,* 46 Harv. L. Rev. 226, 237 (1932) ("the exploration of issues, particularly through sharp questioning from the bench—continues to be one of the liveliest traditions of the Court").

erally equate to lack of decorum. As indicated above, we have listened carefully to the questioning of Justice Hill and believe it demonstrates that he had conflicting interests. In other settings without the improper influences present here, the questions might be seen as tough but fair. It may be that each of us recalls interrupting a lawyer whose answer to a question is nonresponsive. In any event, we cannot find by clear and convincing evidence a violation of Canon 3A(3) in Justice Hill's conduct during the oral argument of September 8, the sole justification for sanctions under this Canon in this case.

### D. Canon 3A(4)

Canon 3A(4) prohibits ex parte communications concerning a pending or impending proceeding. The Board found that Justice Hill violated this Canon by hand delivering the letter about the Wheel investigation to the Attorney General. For purposes of evaluating this issue, we do not have to review the propriety of the letter, admittedly signed on behalf of the full Court, or the actions of Justice Hill prior to the signing of the letter.

We can think of no purpose to Justice Hill's conduct except to intimidate the Attorney General. The personal delivery of the letter, accompanied by Justice Hill remaining while the letter was read, could only convey the extreme urgency and importance of the matter to Justice Hill. It was extremely unusual for a Justice of the Supreme Court to initiate a personal contact with an executive branch prosecutorial officer for purposes of influencing his actions. It was, beyond argument, an ex parte communication concerning an impending proceeding as those terms are used in Canon 3A(4).

We recognize that leaks to the press surrounding the Wheel investigation were undermining public confidence in the Vermont Judiciary and that rumors and innuendo were being printed about all parties investigated during the Wheel probe. We also recognize that press accounts involved Justice Hayes, a member of the Supreme Court. Finally, we are very much aware that the role of the Supreme Court as the head of an independent Judicial Branch of government may have required it to act to protect the Judiciary from the attacks upon its independence, integrity and professionalism. But the Code of Judicial Conduct must be concerned about the means employed to

convey a message. The appearance of Justice Hill's action went well beyond a good-faith exercise of constitutional responsibilities to protect the Judiciary. It necessarily chilled the Attorney General's action in his responsibility to enforce our criminal laws. We find by clear and convincing evidence that Justice Hill violated Canon 3A(4).

### E. Canon 3C(1)

Canon 3C(1) requires recusal by a judge in a proceeding "in which his impartiality might reasonably be questioned." The Board found a number of violations of this Canon due to Justice Hill's continuing participation in *State v. Hunt*, in matters related to Judge Wheel and in his participation in the decision to suspend Judge Wheel with pay. Not only could Justice Hill's impartiality "reasonably be questioned," it was being questioned by motions to disqualify him and speculation in the press. Despite these circumstances, he failed to disqualify himself until faced with a disciplinary investigation. For the reasons discussed above, we concur in the Board's conclusions and find by clear and convincing evidence that Justice Hill violated this Canon.

*Under the authority of Chapter II, Section 30, of the Vermont Constitution, 4 V.S.A. § 3 and 12 V.S.A. App. I, Part IV, Rule 9, this Court finds that Justice William C. Hill violated Canons 2A, 3A(4) and 3C(1) of the Code of Judicial Conduct. 12 V.S.A. App. VIII, A.O. 10. By Monday, September 25, 1989, at 4:30 p.m., counsel for Justice Hill and Special Counsel to the Board shall file what information they deem appropriate on the sanction that this Court shall impose. An oral argument on the appropriate sanction is hereby set for Tuesday, September 26, 1989, at 1:00 p.m.*